234 N.J. Super. 559 (1989)
561 A.2d 288
CAROL ANN FELDMAN, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID COMPANY, A MAINE CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 1989.
Decided July 13, 1989.
*563 Before Judges MICHELS, MUIR, Jr. and KEEFE.
William C. Slattery, argued the case for the appellant and cross-respondent Lederle Laboratories, a Division of American Cyanamid Company (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; and Norris, McLaughlin & Marcus, of counsel; James L. Melhuish and William C. Slattery, of counsel and on the brief; Scott Friedman, Michael K. Tuzzio, Kevin E. Wolff, Robert S. Corcoran, on the brief).
James I. Peck, IV, argued the case for the respondent, cross-appellant.
Marc S. Klein argued the case for the amici curiae, Pharmaceutical Manufacturers Association and E.R. Squibb & Sons, Inc. (Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, attorneys; Charles J. Walsh, Marc S. Klein, Bruce J. Brennan, Geoffrey R.W. Smith, Howard L. Dorfman, of counsel and on the brief).
The opinion of the court was delivered by KEEFE, J.S.C. (temporarily assigned).
In this failure to warn product liability case, defendant Lederle Laboratories (Lederle), a division of American Cyanamid Company, appeals from an adverse jury verdict in favor of plaintiff, Carol Ann Feldman.[1] The general theory of liability *564 presented by plaintiff at trial was that Lederle's product, Declomycin, was defective in the years 1960 through 1963 because it lacked a warning that its ingestion by young children might result in tooth staining. Lederle argues on appeal that plaintiff's failure to warn claim is preempted by federal law. Alternatively, Lederle argues that certain trial errors regarding evidence matters and jury instructions require a new trial.[2] By leave of court, Pharmaceutical Manufacturer's Association and E.R. Squibb & Sons, Inc. filed a brief as amici curiae, joining in Lederle's preemption argument. Amici also argue that imposing liability on Lederle under the facts of this case conflicts with the public policy considerations underlying New Jersey's product liability law.
We conclude that the Food and Drug Administration's (FDA) regulation of the drug industry does not warrant a finding of implied federal preemption of all State tort claims grounded in strict liability failure to warn. However, under certain circumstances, such as presented here, federal law may preempt a discrete issue upon which liability is predicated because compliance with State decisional law would require federal law to be violated. Thus, plaintiff's entire cause of action was not preempted. However, the theory of liability not preempted was decided adversely to plaintiff by the jury and is not challenged on appeal, while the theory of liability which undergirded the jury verdict against Lederle was preempted by federal law. Thus, Lederle's motion for judgment notwithstanding the verdict should have been granted. Because the preemption issue resolves this appeal we do not address the other issues raised by Lederle.[3]
*565 Plaintiff was born in February, 1960 and alleges that she was treated with Declomycin produced by Lederle during the period from her infancy into her fourth year. Declomycin is one of a group of tetracycline containing drugs which are broad spectrum antibiotic analogues used to combat bacterial infections.[4] Plaintiff's father, Dr. Harold Feldman, prescribed the medication for plaintiff in order to treat various illnesses. He was introduced to Declomycin by a Lederle medical representative in approximately 1959 when it was first marketed. Lederle had recommended the drug for pediatric use in its product labeling during the years 1960 through 1963 inclusive.
No medical records were kept by Dr. Feldman of plaintiff's treatment. However, he testified that he first gave the drug to his daughter approximately two to three months after her birth and continued to administer it until 1963, or possibly 1965.[5] Regardless of the time period, the doctor stated that he administered Declomycin only a total of eight to ten times over this period because the plaintiff was generally healthy. In 1965, Dr. Feldman noticed that his daughter's teeth were stained a shade of grey. He took her to Dr. Sachs, the family dentist, to learn the cause and was then informed of the correlation between tetracycline and tooth staining.
Dr. Milton Houpt testified as an expert in pediatric dentistry for the plaintiff. He examined her in January, 1985 and concluded that her teeth had been stained by tetracycline. The doctor testified that the staining on plaintiff's teeth was possibly consistent with tetracycline administration until the age of six or seven.
*566 Dr. Feldman testified that in the 1960's, in addition to relying on the Lederle detailmen and package inserts, he relied on the Physician's Desk Reference (PDR) for information about Declomycin. The PDR did not contain a warning concerning tooth staining until 1965, although package inserts and other literature were changed in December, 1963.
In 1975, Dr. Feldman wrote a letter of inquiry to Lederle Laboratories concerning the staining problem. He received a reply from Lloyd S. Carr, Lederle's product's service manager. The letter, dated November 6, 1975, stated that, after "the causal relationship between tooth staining and tetracycline became unquestionably demonstrated," Lederle notified the FDA in November, 1962 requesting permission to place a warning on the drug. The letter noted that Declomycin was specifically excluded by the FDA in April, 1963 from the requirement imposed on other tetracyclines to contain a warning concerning tooth staining. It further stated that in or about May, 1963, Lederle informed the FDA that Declomycin was also implicated in reports of tooth staining. Lastly, it said that a warning for Declomycin was approved by the FDA in December, 1963 and appeared in the PDR in 1965.
Plaintiff's theory was that Lederle knew or should have known of the side effects before 1962. Her proofs on that issue were substantially based on two articles co-authored by Dr. Harry Shwachman. The articles were entitled "The Tetracyclines, Applied Pharmacology" and "The Effect of Long Term Antibiotic Therapy in Patients With Cystic Fibrosis of the Pancreas." Dr. Shwachman, a specialist in cystic fibrosis, testified on behalf of plaintiff by way of a de bene esse deposition. He related conversations he had with Dr. Carey, the deceased former medical director of Lederle, in which Dr. Shwachman told Dr. Carey about the "problem of staining of the teeth" he had encountered in using tetracyclines to treat children with cystic fibrosis. However, Dr. Shwachman admitted that both articles, published in 1956 and 1958, were inconclusive as to the cause of the observed tooth staining and were *567 based solely on work with cystic fibrosis patients who were treated with the tetracycline drugs on a daily basis over a long period of time. Further, none of this work involved Declomycin, which was introduced in 1959.
In a letter dated January 10, 1963, addressed to Roy Schaefer at Lederle, Dr. Shwachman detailed his findings, at Schaefer's request, concerning tooth staining in cystic fibrosis patients up to that point in terms of age versus dosage. The letter revealed an apparent correlation between tetracyclines and tooth staining without drawing any real conclusion. As stated in the letter by Dr. Shwachman, "[t]he study is still being continued and I think that the specific answer to your questions will become obvious in due course of time."
Dr. Swanzey, who had been employed by Lederle in the 1960's, was called as plaintiff's witness and examined concerning the Shwachman articles. He testified that both of the articles were in the possession of the defendant in 1960. Each article contained a notation to the effect that tooth staining had been observed in cystic fibrosis patients who were treated with tetracyclines. He noted that both articles had been written in the 1950's, before Declomycin was marketed. Thus, Declomycin was not the tetracycline containing product referred to in either article. Dr. Swanzey stated that, even after the publication of the second study, it was not clear whether the tooth staining was due to the drug or the disease of cystic fibrosis. To Dr. Swanzey's knowledge, no comparative study was done on the teeth of cystic fibrosis patients who had received tetracycline versus those who had not to determine if the discoloration was due to the antibiotics or the disease itself.
Defendant presented Doctors Guggenheimer, Sweeney, and Wasserman to testify concerning the state of scientific knowledge in the relevant time period. Dr. Guggenheimer, a dentist and professor of dentistry, opined that there was no information available suggesting a relationship between the administration *568 of tetracyclines and tooth discoloration in 1960 and 1961. He testified that reports began to appear in 1962 which raised questions as to whether there was a relationship between tooth discoloration, cystic fibrosis and the tetracyclines, but the medical investigators "could not come to any conclusion as to what exactly was going on." The doctor cited an editorial in The New England Journal of Medicine in 1963 which "indicated that more evidence was needed as to what exactly the mechanism [for discoloration] was and why this was occurring." The apparent reason for the confusion was that all children with stained teeth were also cystic fibrosis patients. Dr. Guggenheimer said it was impossible to separate the two phenomena. The doctor had participated in animal studies at Columbia University in the early 1960's to attempt to answer this question but could not do so because no significant effect could be found at that time on the teeth of animals. When asked his opinion regarding Declomycin, Dr. Guggenheimer said:
Since that particular antibiotic was, I believe, introduced in 1959, by 1963 there would  it would not be possible to identify it as a cause of tooth discoloration because any person receiving the antibiotic in 1959, their permanent teeth would not have yet appeared in 1963. The earliest that would be come evident would be approximately 1965.
He concluded that, with regard to Declomycin, Lederle could not have known of the correlation until after 1963.
Dr. Sweeney, a dentist educator, testified that prior to 1962 Lederle could not have known "in any way, shape or form" that the use of tetracyclines resulted in stained teeth. The doctor noted that only three or four papers had been written on the subject in that time frame and they were inconclusive. In his opinion, 1962 was a critical year because evidence began to indicate that the teeth of children other than cystic fibrosis patients might be affected by tetracyclines. Dr. Sweeney felt that Lederle should have known there was a problem with Auromoycin and Acromycin in 1963, but not Declomycin, because there were no reports in 1963, or earlier, pertaining to *569 Declomycin.[6] Dr. Wasserman, a pediatrician and professor of medicine, also testified that there was insufficient information about the possibility of tooth discoloration from the use of tetracyclines through 1963.
Plaintiff offered a three page Lederle Laboratories District Manager Weekly Report, dated August 18, 1962, as further proof of Lederle's knowledge. The report read in part:
We are beginning to hear comments about the yellowing discoloration of teeth in children following tetracycline therapy. One physician, already reported to Pearl River, [Lederle's home base] also states his own children's second teeth are soft following tetracycline therapy. This physician states he will discontinue using tetracyclines until this phenomenon is proved or disproven.
In October, 1962, Dr. Swanzey and his associates began to compose a warning concerning tooth staining caused by tetracycline drugs for submission to the FDA. On November 16, 1962, Dr. Swanzey wrote a letter to the FDA concerning the possibility of a correlation between tooth discoloration and Lederle's tetracycline drugs. In the letter, Lederle proposed to warn of the phenomenon in terms of all its tetracycline products. Lederle submitted its proposed warning language and asked for the FDA's "opinion and consideration" so that this statement could "be added at the earliest possible time." On December 3, 1962, Dr. Barzilai, medical officer, Division of Antibiotic Drugs, Bureau of Medicine of the FDA, replied to Dr. Swanzey's letter. Dr. Barzilai stated that the FDA had "not yet reached any form of final opinion (= medical, scientific, regulatory, etc.), ..." He concluded by informing Dr. Swanzey that the FDA was currently "devoting a great deal of active attention to the matter and [would] ... notify as soon as any conclusion is reached."
In February, 1963, Dr. Barzilai wrote to Dr. Swanzey advising him that the FDA had approved the warning to be asserted in the printed material of "all [Lederle's] tetracycline products...." *570 On February 14, 1963, Dr. Swanzey, in acknowledging receipt of the FDA's letter with the approved warning language for all tetracycline drugs, wrote to the FDA, stating, "I assume that this statement is being proposed for chlortetracycline, oxytetracycline[7] and demethylchlortetracycline [Declomycin] as well."[8]
On February 18, 1963, Dr. Barzilai replied to Dr. Swanzey's inquiry and stated that the warning had to appear in the labeling of only tetracycline, chlortetracycline, and oxytetracycline. Dr. Barzilai further stated, "[t]here is practically no specific clinical evidence to substantiate such a labeling requirement for demethylchlortetracycline [Declomycin] at present, but we intend to remain alert for such a future possibility."
On April 18, 1963, the FDA issued a press release to all medical and dental journals, and to the general media, with respect to tooth discoloration and tetracyclines. The release stated in pertinent part:
Children's teeth can be seriously discolored by three types of tetracycline antibiotics, the Food and Drug Administration said in a message to physicians and dentists.
The three drugs are: tetracycline, chlortetracycline and oxytetracycline. There is no evidence to date that a fourth drug, [declomycin], causes the discoloration, FDA said.
On April 23, 1963, Lederle issued an "Action" memorandum to all Lederle sales personnel. The purpose of the memo was to advise the sales people of the latest information concerning FDA requirements for antibiotic literature, and its specific subject was tooth staining. The memo told the salesmen that inserts would be sent to them shortly for inclusion with all of the tetracycline based drugs except Declomycin. Further, the memo told the salesmen not to capitalize on the fact that *571 Declomycin had been excluded from FDA warnings because Declomycin would probably soon be implicated in staining and require warnings as well.
On May 8, 1963, Dr. Swanzey wrote to Dr. Barzilai to bring the FDA up to date on additional information concerning the subject of tooth discoloration that had come into Lederle's possession since Swanzey's last correspondence. Enclosed with that letter was an article printed in the June, 1962 issue of the Canadian Medical Association Journal, together with another document which quoted from the first, suggesting that Declomycin was associated with tooth discoloration and looseness of finger nails.
On May 31, 1963, Commissioner Larrick of the FDA wrote to Dr. Swanzey and explained why the warning approved by the FDA for tetracycline products specifically exclude Declomycin. He said:
Actually, the original statement was revised to require the inclusion of the name of the drug in lieu of the word "tetracyclines" because to date we have no evidence that your drug [Declomycin] will stain teeth. If the warning statement as originally proposed is used, it automatically incriminates [Declomycin].
On July 1, 1963, Dr. Barzilai replied to the May 8, 1963 letter from Dr. Swanzey and said that the FDA had reviewed all of the Declomycin adverse incident reports and other information supplied by Lederle but that it could not "as yet justify any change in our current formal position on this matter."
On November 8, 1963, in a telephone conversation between Kevin Rooney of Lederle and Dr. Barzilai that was later confirmed in a letter from Rooney to Barzilai on November 11, 1963, it was finally decided that Lederle would incorporate the tooth staining statement in all of the labeling for Declomycin products. Submission of the final form of the Declomycin tooth staining warning was made by letter to the FDA dated December 12, 1963.
The plaintiff's position, as stated earlier, is that Declomycin was defective in the years 1960 through 1963 because it lacked a warning concerning tooth staining during those years. It *572 was in the context of the foregoing facts and plaintiff's theory of liability that the trial judge asked the jury to answer the following special interrogatory.
Was there a defect in defendant Lederle's product, Declomycin, because it failed to warn of tooth discoloration?
A. In 1960
B. In 1961
C. In 1962
D. In 1963
The jury, in response to the above interrogatory, replied that Declomycin was not defective in either 1960 or 1961. In doing so it rejected plaintiff's argument that the articles authored by Dr. Shwachman and Lederle's own research should have put Lederle on notice of the dangers of tooth staining with respect to Declomycin before the time when Lederle itself became concerned about that side effect.
However, the jury found that the product was defective in 1962 and 1963. Specifically, with respect to Lederle's defense that it gathered sufficient information upon which to warn by the fall of 1962 but that FDA regulations required prior approval before a warning could be given and that FDA approval was not forthcoming, plaintiff's counsel argued in summation:
Lederle Laboratories could have warned of tooth staining resulting from Declomycin administration in November of 1962. In fact, it could have warned in October of 1962 because you heard Dr. Swanzey say "Well, look, here is a paper dated October of 1962 which has a warning that I divvied up for proposal to the F.D.A." So for 13 months they waited for no reason while kids were getting Declomycin, along with this kid. In those 13 months Dear Doctor letters could have been sent out. In those 13 months some ads could have been placed in the Journal of the American Medical Association or any like professional journal. During those 13 months the detailmen could have been sent out with specific instructions to tell doctors not to prescribe Declomycin for pediatric use.
........
Why Lederle waited 13 months to warn on Declo is for you to surmise, it is not for me to suggest. There is no evidence one way or the other as to why they waited, ladies and gentlemen, aside from the alleged trade practice of getting F.D.A. approval first on warnings. Trade practice; what other drug manufacturers do. If you find that a compelling reason for them to wait 13 months, then you can find against the plaintiff, you can find no cause for action; but if *573 you find that there was no good reason for waiting those thirteen months, then I suggest you return a verdict for the plaintiff.[9]
In view of plaintiff's theory of liability pertaining to the years 1962 and 1963 as set forth in the closing argument and the trial judge's instructions to the jury that prior approval from the FDA was not required, we can only conclude that the jury determined liability against Lederle based on its failure to warn during the 13 month period that elapsed between November of 1962, when it first wrote to the FDA for permission to change its labeling, and December of 1963, when the FDA approved the label change and Lederle complied.
Plaintiff contends that the Supreme Court's decision in Feldman v. Lederle Laboratories, 97 N.J. 429 (1984) (Feldman I) precludes a discussion of preemption. We disagree. In Feldman I, the Court observed that Lederle raised the preemption defense for the first time before the Appellate Division. Id. at 458. However, we decided the appeal on other grounds and did not address preemption. Feldman v. Lederle Laboratories, 189 N.J. Super. 424 (App.Div. 1983), reversed 97 N.J. 429 (1984). Because the defense had not been raised at the trial level and had not been relied upon by us in deciding the case, the Supreme Court could have refused to entertain the issue. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973). When an appellate court recognizes that a case will be remanded for a new trial, it ordinarily "defer(s) discussion of the issue" *574 not fully litigated in the first trial until a complete record is made. Feldman, 97 N.J. at 458. However, the Supreme Court, in this instance, elected to give the trial court guidance by making "comments" on the issue based on the information before it at the time. Ibid. Those comments constituted dicta because they were not necessary to the decision then being made. As such they are entitled to "due consideration but [do] not invoke the principle of stare decisis." Jamouneau v. Division of Tax Appeals, 2 N.J. 325, 332 (1949). Prior decisions of this court have also concluded that Feldman I did not preclude a consideration of preemption in the context of FDA regulation of the drug industry. Shackil v. Lederle Laboratories, 219 N.J. Super. 601, 616, 634 (App.Div. 1987), certif. granted 109 N.J. 519, 520 (1987). See also, McQuaid v. Burlington County Memorial Hosp., 212 N.J. Super. 472, 476 (n. 1) (App. Div. 1986).
Plaintiff argues that, at the second trial of this matter, Lederle's proofs were "no more compelling, and scarcely more numerous, than what it introduced in 1980 or what it submitted by way of argument on first appeal." Lederle disagrees and lists the items placed in evidence at the second trial which were not in evidence at the first trial. They are: 1) the information relating to the possible side effects of Declomycin submitted by Lederle to the FDA subsequent to November, 1962 contained in its letters dated January 15, 1963 and May 8, 1963; 2) the letter from FDA Commissioner Larrick dated May 31, 1963; 3) the letter from Dr. Barzilai of FDA dated July 1, 1963; and 4) the FDA press release, dated April 18, 1963, sent to all medical and dental journals.[10] Clearly, the evidence on the preemption issue was different and more broadly developed at the second trial.
The Supreme Court in Feldman I emphasized the importance of a full factual development when it said:

*575 "Cases state principles but decide facts, and it is only the decision on the facts that is binding precedent." [97 N.J. at 455 quoting Konrad v. Anheuser-Busch, Inc., 48 N.J. Super. 386, 388 (Law Div. 1958)].
The Supreme Court could not have foreseen at the time it wrote Feldman I that the jury would reject plaintiff's contention that Lederle knew or should have known of the tooth staining side effect prior to 1962 when Lederle admitted it first became aware of the relationship. Nor are we certain that the Court knew that plaintiff's argument at the re-trial, relative to Lederle's conduct in 1962 would be limited to Lederle's duty to warn without the FDA's prior approval and notwithstanding the FDA's refusal for 13 months to approve Lederle's request. For these reasons we feel that the Supreme Court has not foreclosed a consideration of the preemption defense raised by Lederle.
The concept of federal preemption is rooted in the Supremacy Clause of the federal Constitution. U.S. Const. Art. VI, cl. 2. State law that conflicts or interferes with federal law must yield because of this constitutional provision. State law which may conflict with federal law includes the state's common law. International Paper Company v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Likewise, federal regulations, such as those promulgated under the Food, Drug & Cosmetic Act of 1938 (FDCA), 21 U.S.C. § 301, et seq., have the same preemptive effect as federal statutes, as long as the federal regulations are within the framework of the enabling legislation and are not arbitrary. Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141, 153-154, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664 (1982). Plaintiff does not contend that the federal regulations relied upon by Lederle were beyond the statutory authority of the regulatory agency to promulgate.
"Determining when ... conflict or interference exists is frequently a complex and intricate matter...." U.S.A. Chamber of Commerce v. State, 89 N.J. 131, 141 (1982). It has been suggested by our Supreme Court that the "[p]reemption analysis *576 begins with identifying the subject matter of the state law and determining whether there is a federal law operative in that field." Id. at 142. The decisional law of New Jersey holds that it is "unquestionably" the duty of a manufacturer, who markets a drug without warning of a danger of which it subsequently becomes aware, to communicate the "new warning" to "prescribing physicians as soon as reasonably feasible." Feldman, 97 N.J. at 456. The federal law operative in the same field is the FDCA, 21 U.S.C. § 301, et seq., which is a thorough and comprehensive statute addressing the licensing, manufacture, sale and marketing of prescription drugs. Specifically, the statute prohibits the "introduction into interstate commerce of any ... drug ... that is ... misbranded." 21 U.S.C. § 331. Regulations promulgated by the Secretary of Health Education & Welfare (Secretary) and administered by the FDA pursuant to the statute address congressional concern for misbranding by establishing guidelines for product labeling, promotional literature and advertising. See generally, 21 C.F.R. § 1.21.
Under the Supremacy Clause, federal law may supersede state law in several ways. First, Congress may preempt state law by stating its intention in express terms. Second, where express preemption cannot be found, Congress' intent to preempt state law may be inferred where the scheme of federal regulation is so comprehensive that it is reasonable to conclude congressional intent to regulate the field to the exclusion of state regulation. Thirdly, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when `compliance with both federal and state regulations is a physical impossibility,' Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248 (1963), ...." Hillsborough County, Fla. v. Auto. Med. Labs., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Lederle concedes that express preemption does not apply in this case, *577 and to the extent that Lederle argues that implied preemption exists, we disagree. However, for reasons that will be stated more fully herein, we conclude that "conflict preemption" applies to these rather unique facts.
"Conflict preemption" is also known as the "dual compliance test," and "concerns those state or local requirements that are incongruous with federal requirements; that is compliance with the State or local requirement causes the federal requirement to be violated, or vice versa." Andre v. Union Tank Car Co. Inc., 213 N.J. Super. 51, 62 (Law.Div. 1987), aff'd 216 N.J. Super. 219 (App.Div. 1987). An example of conflict preemption is provided by the case of Southern Railway Co. v. Reid, 222 U.S. 424, 32 S.Ct. 140, 56 L.Ed.2d 257 (1912). In that case a railroad declined to accept goods for shipment because rates for the requested route had not yet been filed with the Interstate Commerce Commission as required under federal law. The plaintiff sued under a state statute requiring railroads to accept shipments whenever tendered and provided that, for the breach of this obligation, the shipper could recover "all damages actually sustained" together with a $50.00 a day "penalty". Id. at 431, 32 S.Ct. at 140. The U.S. Supreme Court held that the state statute was preempted under federal law because it conflicted with federal requirements:
If the regulation be not exclusive, this situation is presented: If the carrier obey the state law, he incurs the penalties of the Federal law; if he obey the Federal law, he incurs the penalties of the state law. Manifestly one authority must be paramount, and when it speaks the other must be silent. We can see no middle ground. [222 U.S. at 442, 32 S.Ct. at 144].
The explication of our conclusion that conflict preemption applies to this case necessarily begins with a review of the standards applicable to such an analysis. The United States Supreme Court recently said:
[W]e have emphasized that in a situation where state law is claimed to be pre-empted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." (citation omitted). Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to *578 undertake such action. The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. [City of New York v. FCC, 486 U.S. 57, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988)].
Where compliance with federal regulation and state common law is "a physical impossibility," state law is nullified. Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 155, 102 S.Ct. 3014, 3023, 73 L.Ed.2d 664 (1982). Justice Brennan expressed the U.S. Supreme Court's view on this point long ago when he said:
A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce,.... (citations omitted). [Florida Avocado Growers v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217 [10 L.Ed.2d 248] (1963)].
Moreover, when inquiring into the design of the federal regulations it is not necessary to show that the agency specifically intended to preclude state decisional law. Rather, the theory of conflict preemption turns on the effect that tort liability under state law would have on the federal regulatory scheme. See, Palmer v. Liggett Group, Inc., 825 F.2d 620, 626 (1st Cir.1987). Because the federal preemption doctrine is rooted in the Supremacy Clause of the U.S. Constitution, we are required to follow the U.S. Supreme Court's guidelines when analyzing such matters. See, In re Application of Waterfront Comm. of N.Y. Harbor, 35 N.J. 62, 68 (1961), cert. denied 368 U.S. 32, 82 S.Ct. 146, 7 L.Ed.2d 91 (1961).
Implied preemption does not occur simply because the FDCA and FDA regulate drug labeling, including advertisements and promotional material. Such an argument was rejected as overly broad and constitutionally unacceptable in Hillsborough County, Fla. v. Auto. Med. Labs., Inc., 471 U.S. 707, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985). However, conflict preemption in the field of drug labeling has been found to be an acceptable way of accommodating federal and state interests. An example of the application of this narrower approach is found in a recent case involving the DPT vaccine. Hurley v. Lederle Lab. Div. of American Cyanamid, 851 F.2d 1536 (5th *579 Cir.1988), modified 863 F.2d 1173 (5th Cir.1988). In rejecting the trial court's decision that plaintiff's cause of action was impliedly preempted by the pervasive federal regulation of drug warnings, the Circuit Court observed that the FDA:
[A]ccepts information given by manufacturers proposing the licensing of a particular vaccine, and determines a proper warning based upon the information provided. 21 C.F.R. §§ 601.2, 601.12, 601.25. A state law determination on this issue should not be interjected to overrule the decision of the FDA. Such a procedure would place vaccine manufacturers in a position where they could not comply with both obligations. The FDA extensively regulates the contents and wording of these product inserts. See, e.g., 21 C.F.R. §§ 1 and 201; 50 Fed.Reg. 51.108 (1985). A manufacturer must first provide all the relevant information to the FDA, which then determines a warning it deems appropriate. The manufacturer is required to print that precise warning in its product insert. Id. Most important, the manufacturers cannot change the language in the product insert without FDA approval. 21 C.F.R. § 601.12. It would be patently inconsistent for a state then to hold the manufacturer liable for including that precise warning when the manufacturer would otherwise be liable for not including it. Thus, assuming that the FDA has processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state. [Id. at 1179].
After concluding that the plaintiff's state tort claim was preempted, to the extent that state law made a manufacturer liable for including the precise warning required by the FDA, it said,
[a] factual issue remains, however, as to whether the manufacturer provided the FDA all the necessary and available information on which to base the warning. Thus, the only question that can be presented to the jury consistent with the federal regulatory scheme is whether the manufacturer withheld, either at the time the FDA decided the content of the warning, or since then, information that would have changed the FDA's decision. [Id. 1179-1180].
While Hurley involves an interpretation of more recent federal regulations, it addresses the same issue presented by the facts of this case. We believe that the narrow approach to preemption exemplified by the Hurley decision properly acknowledges the "restrained view" required by the U.S. Supreme Court in such instances. See, Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, supra; Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); See also, Cippollone v. Liggett Group, Inc., 789 F.2d 181, 186-187 (3rd *580 Cir.1986), cert. den., 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). (Holding that plaintiffs' suit against defendant tobacco companies was preempted only to the extent that plaintiffs' "state law claims `actually conflict' with the Act....")
We now focus on the legislative and regulatory scheme. With the adoption of the FDCA, Congress established a means for federal regulation of prescription drugs. The FDCA was "designed primarily to protect consumers from dangerous products ... by applying the Act to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer." United States v. Sullivan, 332 U.S. 689, 696, 68 S.Ct. 331, 335-336, 92 L.Ed. 297 (1948). The Secretary of Health, Education and Welfare was initially charged with the responsibility for reviewing the safety of all new drugs prior to their marketing. No person could market a new drug unless an application to do so had been approved by the Secretary, at which time the application became "effective." 21 U.S.C. § 355(a).
In 1945, Congress required additional pre-marketing approval procedures for antibiotics. (Declomycin is a prescription drug and an antibiotic). Antibiotics were not known in 1938 when the FDCA was enacted. When penicillin was first introduced, Congress recognized that antibiotics "are spectacularly efficacious in many serious diseases suffered by large numbers of our population." Federal Food, Drug and Cosmetic Act: Hearings on H.R. 3151, H.R. 562, and H.R. 160 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 81st Cong., 1st Sess. 5-6 (1949). At the same time, Congress was concerned about the complications of the manufacture of such drugs and their safe use. Thus, it determined to bring antibiotics "under even more stringent regulation" than regulations governing prescription drugs. Pfizer, Inc. v. Richardson, 434 F.2d. 536, 538 (2d Cir.1970). Accordingly, Congress amended the FDCA to require that each batch of antibiotic and its labeling be certified by the FDA to "adequately *581 insure safety and efficacy...." 21 U.S.C. § 357(a). Efficacy requirements were made applicable to other prescription drugs in 1963. See Pub.L. No. 87-781, 76 Stat. 780 (1962). The Secretary established the FDA as his agent to administer and enforce the FDCA.
Since Congress' overriding purpose in enacting the FDCA was to protect consumers from dangerous drugs and antibiotics, it specifically dealt with the warnings to physicians that must accompany them. Thus, the new drug application required, among other things, that the manufacturer supply the Secretary with "specimens of the labeling proposed to be used for such drug." 21 U.S.C. § 355(b)(1)(F). The application could be approved only if the Secretary found, among other things, that the labeling was not "false or misleading in any particular...." 21 U.S.C. § 355(d).
The concept of "labeling" is a broad one. It includes "all labels or other written, printed or graphic matter" upon the container of the drug, or which "accompany such article." 21 U.S.C. § 321(m). Any information which "supplements or explains" the labeling is considered to "accompany such article" and thus is a part of the product's labeling. Physical attachment of the information to the product is not necessary. Kordel v. United States, 335 U.S. 345, 350, 69 S.Ct. 106, 109-110, 93 L.Ed. 52 (1948), Reh. Den., 335 U.S. 900, 69 S.Ct. 298, 93 L.Ed. 435 (1948), Reh. Den., 336 U.S. 911, 69 S.Ct. 513, 93 L.Ed. 1075 (1949). Rather, the "textual relationship" of the communication to the article is the "significant" factor in determining whether the communication constitutes "labeling". Ibid. Thus, package inserts and all other communications to physicians with respect to the use or safety of a drug are considered to be "labeling" subject to FDA approval.
Lederle supplied labeling to the FDA in 1959 in connection with its application to market Declomycin. The labeling did not contain a warning that the drug may cause tooth staining if administered to infants and young children. The FDA approved *582 Lederle's application, and, thus, it must be implied that the FDA determined, "based on a fair evaluation of all material facts," that Lederle's labeling was not "false or misleading in any particular." 21 U.S.C. § 355(d)(7). Plaintiff does not now contend that Lederle supplied either false or misleading information in order to secure FDA approval or failed to supply information that if supplied would have prevented such approval. Indeed, the jury's verdict finding no defect in the product in 1960 or 1961 precludes such an argument.
Because the jury found that Lederle's product was defective in 1962 and 1963, an analysis of the FDA regulations and procedures in effect in 1962 concerning changes in previously approved drug labeling, prompted by the post-marketing discovery of side effects, is critical to this appeal. One such regulation pertaining to labeling in connection with new drug applications provided:
It is understood that all representations in this application regarding ... labeling apply to the drug produced until an effective supplement to the application provides for a change or the article is no longer a new drug. [21 C.F.R. § 130.4(c)(9), 21 Fed.Reg. 5579 (July 25, 1956). (emphasis added)].
As applied to the facts of this case, the wording of the regulation suggests that Lederle's approval to market Declomycin was conditioned upon no change being made in the labeling until an "effective supplement to the application" was processed.
Supplemental applications were expressly required by the FDA "if a material change [was] made in the ... labeling ... from the representations in an effective application for a new drug," and if "the drug [was] marketed before a supplement [was] effective for such change, the [new drug] application may [be] suspended...." 21 C.F.R. § 130.9(a), 25 Fed.Reg. 12595 (December 9, 1960). "Labeling changes [included] deviations from the authorized brochures in any mailing or promotional pieces used after the drug is placed on the market." Id. (emphasis added) Conversely, a supplemental application was not required for changes in labeling that were "not significant *583 from the standpoint of the safety of the new drug as established by the original new-drug application," but, even under those circumstances, the FDA had to be informed of the "proposed change or changes...." Thereafter, the applicant was "notified in writing whether, in the Food and Drug Administration's opinion, the submission of a supplemental application [was] required for such change or changes. This include[d] all mailing and promotional pieces that [were] to be used after the new drug [was] placed on the market." 21 C.F.R. § 130.9(b), 25 Fed.Reg. 12595 (1960).
Unlike other drugs, after the initial approval of an antibiotic, the antibiotic manufacturer was required to request certification of each batch before it was marketed. 21 C.F.R. § 146.2 and 146.3 (1963). Before a batch could be certified, the FDA was required to find that the labeling did not contain any "untrue statement of a material fact," that it contained "all words, statements, and other information required by the regulations," and that it otherwise met all the statutory standards for adequate warnings. 21 C.F.R. § 146.3 and 146.4 (1963). Furthermore, the regulations precluded antibiotic manufacturers from altering approved labeling in any respect without prior authorization because the certification of any batch of antibiotics ceased immediately to be effective if the "labeling [was] altered ... in whole or in part, or cease[d] to conform to any labeling requirement...." 21 C.F.R. § 146.4(b)(2) (1963). This included promotional labeling. (advertisements, mailing and other promotional pieces) 31 Fed.Reg. 11415 (August 30, 1966).
Subsequent amendments to the FDA regulations also shed light on the interpretation of the 1962 regulations applicable to changes in drug labeling. Grove City College v. Bell, 465 U.S. 555, 567-569, 104 S.Ct. 1211, 1218-1219, 79 L.Ed.2d 516 (1984). In January, 1965, the Commissioner of the FDA proposed changes in the regulations regarding supplemental information for both pending new drug applications and supplemental applications. The preamble of the proposed amendments stated the following:

*584 The Commissioner of Food and Drugs has concluded that in the interest of drug safety certain kinds of changes in the labeling and manufacturing of new drugs, proposed in supplemental new drug applications, should be placed into effect at the earliest possible time. Accordingly, the new-drug regulations (21 CFR 130.4, 130.9) are amended, as hereinafter indicated, to enable prompt adoption of such changes. [30 Fed.Reg. 993 (January 30, 1965)].
Because this case involves a change in labeling subsequent to the approval of the new drug application for Declomycin, the amendment to C.F.R. § 130.9 is relevant to this inquiry. In that respect, subparagraph (d) was added in 1965 to the 1960 version of C.F.R. § 130.9. It provided that labeling changes containing "additional warning, contraindication, side-effect, and precaution information" may be placed in the product labeling and promotional literature "at the earliest possible time...." § 130.9(d)(1). C.F.R. § 130.9(e) was also added. It provided assurance to the manufacturer that the FDA would "take no action against a drug or applicant solely because changes of the kinds described in paragraph (d) of this section are placed in effect by the applicant prior to his receipt of a written notice of approval of a supplemental new-drug application...." Id. However, even under the 1965 amendments, "once FDA has acted on the supplement  for example, by rejecting it  the manufacturer has no freedom to alter the package insert by adding information different from or in addition to what FDA has approved." Cooper, Drug Labeling and Products Liability: The Role of the Food and Drug Administration, 41 Food, Drug Cosm. L.J. 233, 235 (1986).[11]
In 1966, the process of mandatory prior approval for antibiotics was also slightly modified in that changes in mailing and promotional pieces were exempted from prior approval but only if certified by the manufacturer as "essentially" the same as the labeling previously approved by the FDA. 21 C.F.R. *585 § 146.2 (1967), 31 Fed.Reg. 11415 (Aug. 30, 1966). In connection with that change, Commissioner Goddard stated:
Heretofore, the regulations have required specific advanced approval of each mailing piece. Upon this order becoming effective, initial promotional labeling must be approved before use, but subsequent mailing and promotional pieces certified by the applicant (or authorized representative) to be essentially the same as the approved labeling, need not be given prior approval. [31 Fed.Reg. 11415 (August 30, 1966)].
Except for that change, however, the FDA approval procedures for changes in antibiotic labeling, unlike those for prescription drugs, remained intact. Ultimately, the FDA began regulating antibiotics like most other prescription drugs and authorized labeling changes for them without advanced approval in those limited circumstances permitted for other prescription drugs. As the FDA noted, however, until those changes were made all antibiotic labeling changes (except those advertising changes previously referred to) "require[d] FDA approval of the change[s] before [they could] be made." 47 Fed.Reg. 46635 (October 19, 1982).
Clearly, a proposed warning that Declomycin causes tooth staining when administered in the developmental process of tooth formation constitutes "a material change" in the labeling of the product. Under C.F.R. § 130.9(a) (1960), Lederle faced a suspension of its new drug application if the drug was marketed with the new labeling "before a supplement [was] effective for such change," if the labeling "contain[ed] an untrue statement of a material fact." Lederle petitioned the FDA in November, 1962, for permission to add an appropriate warning to the labeling for "all oral and parenteral tetracycline and chlortetracycline products...." It is clear from the FDA correspondence of February 18, 1963 and April 12, 1963 addressed to Lederle that the FDA did not believe Lederle's suggested warning change was a true statement, at least as to Declomycin, because it specifically excluded Declomycin from the warning requirement. Although plaintiff's counsel argued in his summation to the jury that Lederle lobbied the FDA for that exclusion, there is no evidence in the record to support such an *586 inference. It is clear that the FDA's letter of February 18, 1963 to Lederle was in direct response to Dr. Swanzey's inquiry of February 14, 1963, which on its face was only a request for clarification from the FDA. Dr. Swanzey's letter to the FDA requesting clarification of the FDA's position simply stated: "I assume that this statement is being proposed for chlortetracycline, oxytetracycline and demethylchlortetracycline as well." Indeed, the labeling ultimately suggested by the FDA in its letter of April 12, 1963 to Lederle specifically excluded the generic term "tetracycline" from the warning and provided a blank space in the body of the warning so that each manufacturer could substitute the brand name of the product for which a warning was required.[12] Moreover, the FDA's press release to medical and dental journals, dated April 18, 1963, specifically excluded Declomycin from the warning when it said in part: "[t]here is no evidence to date that a fourth drug, demethylchlortetracycline, causes the discoloration, FDA said."
Plaintiff argues that "FDA interpretation of the FDCA for twenty-two years has officially sanctioned placement of warnings without its prior approval [30 Fed.Reg. § 993-994 (1965)]; ...." We agree with plaintiff's statement as far as it goes, but it is irrelevant in the context of this case. Notably, the federal regulation relied upon by plaintiff in making the statement is the 1965 amendment which substantially changed *587 the wording of the applicable 1962 regulation. The focus must appropriately be on FDA's requirements in 1962 when Lederle acted upon its acquired knowledge, not the FDA's amended regulations in 1965.
Plaintiff does not challenge Lederle's or amici's interpretation of the FDA regulations in force in 1962. Rather, plaintiff relies upon the brief reference in Feldman I to 21 C.F.R. 130.9., 25 Fed.Reg. 12,595 (1960) and the Court's statement: "We note that the regulation did not prevent a drug manufacturer from adding an additional warning as soon as it was aware of its necessity." Feldman, 97 N.J. at 459. We do not know the context in which that regulation was placed before the Supreme Court. The passage from the regulation quoted by the Court was taken from paragraph (b) of C.F.R. § 130.9 (1960). We are constrained to observe that paragraph (b) addresses the procedure to be followed when the manufacturer proposes changes in "labeling, ... that are not significant from the standpoint of the safety of the new drug as established by the original new-drug application." (emphasis added). C.F.R. § 130.9(b) (1960).
In the context of the material contained in the record before us, we conclude that C.F.R. § 130.9(b) (1960) was inapplicable to the change in labeling proposed by Lederle in November, 1962. Lederle's proposal was clearly a significant departure from its prior labeling of all its tetracycline products and impacted greatly on safety. Under the circumstances, C.F.R. § 130.9(a) (1960) was the applicable regulation. It provided in part:
A supplemental application should be submitted for any change ... that may alter the conditions of use, the labeling, the safety, ... or purity of the drug.... Labeling changes include deviations from the authorized brochure in any mailing or promotional piece used after the drug is on the market.... If a material change is made in the ... labeling or advertising, from the representations in an effective application for a new drug, and the drug is marketed before a supplement is effective for such change, the application may be suspended under § 130.27 on the grounds that it contains an untrue statement of a material fact. [C.F.R. § 130.9(a) (1960)].
*588 We believe that the clear wording of this paragraph required Lederle to seek the approval of the FDA to change the package inserts dispensed with the drug, including any "mailing" or "promotional piece[s]" or suffer suspension of its "effective" new drug application. In addition, the FDA's correspondence with Lederle, the 1965 amendments to § 130.9, and the statements by the Commissioner concerning the purpose of the later amendments, are extrinsic aids in support of our interpretation of the regulations applicable to Lederle in 1962. An administrative agency's interpretation of its own regulations is controlling "unless it is plainly erroneous or inconsistent with the regulation." Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); In re Appeal of Lembo, 151 N.J. Super. 242, 249 (App.Div. 1977). Plaintiff has not argued that the FDA's refusal to allow Lederle to change the warning was conduct inconsistent with its regulatory authority. Indeed, we find that the FDA's conduct comported in all respects with the wording of the regulations.
Only two cases have been located which specifically interpret the 1960 version of C.F.R. § 130.9(a). Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 835, 848 (2nd Cir.1967) and Miller v. Upjohn Co., 465 So.2d 42, 45 (La. App.Ct. 1985), cert. denied 467 So.2d 533 (1985). Both cases interpreted the regulation applicable at that time to require prior approval from the FDA before a labeling change could be made.[13]
Plaintiff argues that cases are legion that hold compliance with FDA labeling requirements is insufficient to preclude tort liability against drug manufacturers. Plaintiff cites a statement made by the FDA Commissioner in 1978 that "the boundaries *589 of civil tort liability for failure to warn are controlled by applicable State law." MacDonald v. Ortho Pharmaceutical Corp., 394 Mass. 131, 475 N.E.2d 65, 70 (1985), cert. den. 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985) (Referring to the preamble to the 1978 FDA regulations. 43 Fed.Reg. 4214. January 31, 1978); see also, Odgers v. Ortho Pharmaceutical Corp., 609 F. Supp. 867, 877 (D.Mich. 1985); McEwen v. Ortho Pharmaceutical Corp., 270 Or. 375, 528 P.2d 522, 533-535 (Or. 1974). However, the Commissioner's statement was made in the context of the existing FDA regulation which, at that time, did not require prior approval of labeling changes. (Specifically, MacDonald, Odgers and McEwen involve birth control pills and address the issue of whether the drug warnings approved by the FDA must be given to the consumer as well as the prescribing physician under state law, and, if so, whether there is anything in the FDA regulations which would preclude a state imposed duty to do so.)
Plaintiff also relies upon cases where the drug manufacturer used FDA approval of the wording of the warning as a defense to the plaintiffs' claim in those cases that the warnings were inadequate. Ezagui v. Dow Chemical Corp., 598 F.2d 727 (2d. Cir.1979); Osburn v. Anchor Laboratories, 825 F.2d 908 (5th Cir.1987) cert. den. ___ U.S. ___, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988). To the extent that such cases suggest that the defendants therein failed to give the FDA information which they had in their possession and such failure contributed to the inadequacy of the warning, they simply recognize the "passive" role of the FDA described earlier in Hurley. 863 F.2d at 1179. An FDA approved warning is only as good as the information provided to it by the manufacturer.[14] If the information *590 is withheld by the manufacturer, we agree with the Hurley court that liability can exist notwithstanding FDA approval of the warning. Id. However, the facts do not support such a claim in this case and plaintiff does not contend that they do.
Osburn and Hurley were decided by the 5th Circuit Court of Appeals. Hurley, the more recent of the two opinions, agreed with Osburn's view that FDA regulation of the drug field is not so pervasive that a general, implied preemption claim can be sustained. The court said: "FDA regulation does not preempt the types of state law duties which are the basis of the plaintiffs' claims: the duty to warn of product risks, e.g. Osburn v. Anchor Laboratories, Inc., 825 F.2d 908, 911-912 (5th Cir.1987)...." Hurley, 863 F.2d at 1177. Yet the court held that there can be narrow preemption of an issue in certain warning cases depending upon the facts. Id. 863 F.2d at 1179. Obviously, the Hurley court saw no conflict between its decision and those cases decided in the same vein as Osburn, which stand only for the proposition that general implied preemption by the FDA is not warranted.
Toner for Toner v. Lederle Laboratories, 779 F.2d 1429 (9th Cir.1986) cert. den. ___ U.S. ___, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988), also relied upon by plaintiff, does not fit neatly into the class of cases exemplified by Osburn and Ezagui, but it is analogous. In that case, plaintiff's theory of liability was that Lederle should have developed a fractionated cell vaccine rather than the whole cell vaccine which it submitted to the FDA for license approval. The question presented was one of the adequacy of Lederle's research. The opinion in the case is far from definitive on the question of preemption because of the Circuit Court's uncertainty of Idaho substantive law. At best, it inferentially recognizes the passive role of the FDA in the *591 licensing scheme and, read liberally in favor of plaintiff, simply holds that Lederle could not rely on the FDA's approval of a whole cell vaccine and the FDA's refusal to relicense a fractionated cell vaccine as a defense to plaintiff's claim that proper research and development would have proven the efficacy of the latter over the former.
While these cases differ from the present case on the facts and plaintiffs' theory of recovery, we agree with plaintiff's general premise here that the great weight of authority holds that state tort law imposing liability for failure to adequately warn about known adverse reactions of prescription drugs is not impliedly preempted by the FDCA or FDA regulations pursuant thereto. We add to those cases previously cited: O'Gilvie v. International Playtex, Inc., 821 F.2d 1438 (10th Cir.1987) cert. den. ___ U.S. ___, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988); Brochu v. Ortho Pharmaceutical Corp., 642 F.2d 652 (1st Cir.1981); Salmon v. Parke, Davis and Company, 520 F.2d 1359 (4th Cir.1975). However, as stated earlier, our decision here is not based on implied preemption, but rather on conflict preemption and is limited to a holding that the specific issue decided by the jury imposing liability on Lederle was preempted as a result of direct conflict between our State's decisional law and the FDA's regulations in 1962.
We adopt the reasoning of the Hurley court. Applying that reasoning to the present case, we conclude that plaintiff's state tort claim was not preempted to the extent that plaintiff sought damages based on Lederle's alleged awareness of Declomycin's side effects earlier than Lederle admitted to have gained such knowledge. That theory of recovery did not conflict with federal law. Indeed, federal regulations and New Jersey decisional law in that respect complement each other. FDA regulations require manufacturers to file annual reports as well as immediate reports of all unexpected adverse reactions. 21 C.F.R. § 130.35(e) and (f). Clearly, New Jersey decisional law also requires prompt response to knowledge of *592 adverse reactions. Feldman, 97 N.J. at 456. Federal regulations which complement state tort law may actually serve to establish a standard of care to which state law may refer. See, Stanton by Brooks v. Astra Pharmaceutical Products, 718 F.2d 553, 563-565 (3rd Cir.1983). However, as stated earlier, the jury's verdict in this case rejected plaintiff's argument on that theory when it found Lederle's product was not defective for lack of warning in 1960 and 1961. The jury found that Lederle's product was defective in 1962 and 1963, but, as indicated earlier in this opinion, the only basis for that finding was its belief that Lederle should have warned in 1962 when it admittedly became aware of the causal relationship between the ingestion of tetracyclines and tooth staining without first seeking the FDA's approval. To the extent that the jury found that Lederle should have warned in 1962 and 1963 based on the trial judge's instruction that prior approval from the FDA was not required, State law is in direct conflict with federal law applicable at that time and must yield. As the U.S. Supreme Court said in Southern Railway Co. v. Reid, supra, there can be no "middle ground" where such a conflict exists and the state law on that point "must be silent." 222 U.S. at 442, 32 S.Ct. at 144.
In Feldman I the Supreme Court expressed concern that a decision interpreting federal regulations to preclude drug manufacturers from warning about side effects without first obtaining FDA approval would appear "anomalous." Feldman, 97 N.J. at 459. That is so because heretofore in New Jersey, at least as to consumer goods, warnings of possible dangers were considered to have no appreciable negative impact on the utility of the product. For that reason it has been said that where warnings are an issue, the risk-utility analysis is irrelevant and a warning should always be given. Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 242 (1981); Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 201-202 (1982). Thus, if federal law were to mirror State law one might assume that a federal agency would require a drug manufacturer to warn as soon as it learns of the adverse effect of the drug.
*593 However, the United States Supreme Court has recognized that in approving a new drug the FDA must balance the "expected therapeutic gains" against the "risks entailed by its use." United States v. Rutherford, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). The FDA draws from a broad range of expertise in seeking to decide the "[u]tilitarian questions regarding `how safe' or `how effective' a given drug must be to justify its usage or marketability." Note, The Drug Amendments of 1962: How Much Regulation?, 18 Rutgers L.Rev. 101, 156 (1963). There is no question that risk-utility determinations govern virtually every stage in the development and approval of a new drug. See, Chien, Issues in Pharmaceutical Economics, (1979). The concept of risk-utility carries over to the labeling process. As the FDA has noted:
Labeling is not intended to be a dispositive treatise of all possible data and information about a drug. It is intended instead to advise about potential hazards and to convey documented statements concerning safety and effectiveness. The Act permits labeling statements with respect to safety only if they are supported by scientific evidence.
........
The Commissioner concludes that drug labeling should include a contraindication only when reasonable evidence exists indicating an association between the drug and a hazard. The Commissioner believes that including theoretical hazards as contraindications in drug labeling would cause that very important section of the labeling to lose its significance. [44 Fed.Reg. 37441, 37447 (June 26, 1979)].
Moreover, the FDA has stated:
It is ... apparent that there are very few statements in prescription drug labeling on which some controversy could not be found within the medical profession. Not infrequently, there are several points of view on a single issue. To permit or require statements of conflicting opinion on all of these matters would destroy the present usefulness of prescription drug labeling. [39 Fed. Reg. 33232 (Sept. 16, 1974)].
With specific reference to the 1962 amendments, the FDA observed:
Under the 1962 amendments ... the Food and Drug Administration is required to review the labeling for every new drug, including the package insert for prescription new drugs, and to approve it as not false or misleading in any particular. In approving the labeling the Food and Drug Administration must determine both that the content is entirely truthful, and that it omits no *594 information pertinent to the safe and effective prescribing of the drug by the physician.... As the law now stands, therefore, the Food and Drug Administration is charged with the responsibility for judging the safety and effectiveness of drugs and the truthfulness of their labeling. [37 Fed.Reg. 16503 (August 15, 1972) (emphasis added)].
Thus, the FDA's interest in risk balancing goes beyond the issue of whether a drug should be marketed. The FDA is interested in "rational prescribing," i.e., insuring that the risks and benefits of a particular drug be fairly presented so that a physician can compare them with other available therapies. That goal "is not advanced if a drug is made to appear riskier than other drugs and other therapies due to the over-dramatization of risk information or the presentation of risk information that should not rationally influence prescribing (or treatment) decisions." Cooper, supra, 41 Food Drug Cosm. L.J. 233, 238. This concept has been judicially recognized.
The quality of evidence supporting a causal connection between product and injury may change from extremely vague to highly certain.... [I]f every report of a possible risk, no matter how speculative, conjectural, or tentative, imposed an affirmative duty to give some warning, a manufacturer would be required to inundate physicians indiscriminately with notice of any and every hint of danger, thereby inevitably diluting the force of any specific warning given. [Finn V.G.D. Searle & Co., 35 Cal.3d 691, 200 Cal. Rptr. 870, 677 P.2d 1147, 1153 (Cal. 1984). See also, Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 991-992 (8th Cir.1969)].
The utility of Declomycin as an antibiotic has never been seriously questioned. Indeed, Dr. Harold Feldman, plaintiff's father, and Dr. Shwachman, plaintiff's expert witness, so testified. See, United States v. An Article of Drug, Etc., 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). Thus, in reviewing Lederle's November, 1962 request to change the labeling of its tetracycline drugs in order to warn of possible tooth discoloration, the FDA had to balance the substantial therapeutic benefits that these drugs had in the treatment of a wide range of infections against the scientifically knowable risks of tooth staining in normal, healthy children. Dr. Barzilai of the FDA, in his December 2, 1962 letter replying to Lederle's proposal, advised Lederle that the issue had to be reviewed from a "medical, scientific [and] regulatory" point of view. In his own *595 way, Dr. Barzilai was advising Lederle that the FDA had to consider the impact such a warning would have on "rational prescribing" if Lederle's suspicions about the side effects proved unfounded.
The "anomaly" exists only if we are compelled to impose current New Jersey decisional law, which ostensibly requires the manufacturer to warn as soon as it learns of the side effects, upon the FDA's judgment in 1962 as to how best to implement the risk-utility analysis necessary for rational prescribing. It is tempting to hold that because the FDA now permits a drug manufacturer to warn without prior approval, thereby placing FDA regulations in harmony with current New Jersey law, Lederle had a duty to warn without waiting for FDA approval. Assuming that our interpretation of the FDA regulations applicable in 1962 is correct, there are two reasons why that cannot be done: one reason is found in State law and the second in federal law. Under New Jersey strict liability law the product's defect must be proven as of the time of marketing not at the time of trial. Feldman, 97 N.J. at 452. Indeed, this concept was made explicit when the Supreme Court distinguished Feldman I from Beshada v. Johns-Manville Products Corp., 90 N.J. 191 (1982) and limited Beshada's future application to "the circumstances giving rise to its holding." Id. 97 N.J. at 455. Beshada had applied a time of trial test in determining whether a defect existed. See Wade, On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing, 58 N.Y.U.L.Rev. 734, 763 (1983). Thus, only the regulations applicable at the time of marketing are relevant. Further, since Feldman I was decided, our Supreme Court has recognized both the risk-benefit analysis of the FDA regulatory scheme and the FDA's policy with regard to how warnings are most effectively communicated. Relying at least in part on that analysis, the Court concluded that a drug company had no tort duty to directly warn the patient of side effects resulting from the administration of DPT vaccine. *596 Niemiera by Niemiera v. Schneider, 114 N.J. 550, 560 (at footnote 3), 562 (1989).
Under Federal law, it is not appropriate for a court using hindsight to say that the FDA's implementation of the FDCA was unwise in the years 1962-1963. Where the FDA's interpretation of the FDCA or its regulations is "sufficiently rational," it must be given deference and such a finding "preclude[s] a court from substituting its judgment for that of the FDA." Young v. Community Nutrition Institute, 476 U.S. 974, 981, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986).
Reversed and remanded for the entry of an order of judgment in favor of the defendant.
NOTES
[1] This case has had a lengthy and arduous legal history. At the first trial of this case in 1980, the jury returned a verdict in favor of Lederle. The plaintiff's motion for a new trial was denied and she appealed. The Appellate Division affirmed per curiam in an unreported opinion. Plaintiff's petition for certification was granted and the Supreme Court remanded the matter to the Appellate Division for reconsideration in light of Beshada v. Johns-Manville Products Corp., 90 N.J. 191 (1982). Feldman v. Lederle Laboratories, 91 N.J. 266 (1982). The Appellate Division affirmed again, this time in a reported decision. Feldman v. Lederle Laboratories, 189 N.J. Super. 424 (App.Div. 1983). A second petition for certification was granted. Feldman v. Lederle Laboratories, 94 N.J. 594 (1983). The Court reversed and remanded the matter to the Law Division for a new trial. Feldman v. Lederle Laboratories, 97 N.J. 429 (1984). It is this second trial that is now before us for consideration.
[2] Although plaintiff filed a notice of cross-appeal her brief did not address any issues raised in the notice. We were advised at oral argument that she has abandoned those claims.
[3] Our failure to address the alternative issues should not be understood to mean that they have no merit. Indeed, we perceive several errors in the jury instructions and evidentiary rulings which, but for our ruling on preemption, would require a reversal and new trial.
[4] The generic name for Declomycin is demethylchloretetracycline.
[5] Plaintiff's amended complaint, filed after the remand for a new trial, alleged that she was administered the medication during 1960-1963. She has limited her claim that the product was defective to those years.
[6] The generic name for Acromycin is tetracycline. The generic name for Auromycin is chlortetracycline. However, there was a tendency to refer to all of these antibiotic analogues, including Declomycin, as tetracycline drugs.
[7] The brand name for oxytetracycline was Terramycin.
[8] It would appear that Dr. Swanzey's inquiry was necessary because Dr. Barzilai used only the word tetracycline in his correspondence rather than the generic names of Lederle's other products that were analogues of tetracycline.
[9] This argument was undoubtedly based, in part, on testimony given by Dr. Swanzey at the current trial and the first trial. In essence, Dr. Swanzey said that he was unaware of any specific statute or regulation that required the FDA to give prior approval to label changes in the relevant time period but that it was the drug manufacturers' practice to do so. Dr. Swanzey hastened to add, however, that he was not an attorney, indicating his lack of expertise in statutory and regulatory interpretations. Whether prior approval by the FDA was required or simply trade practice was a matter of law, not a matter of lay opinion. However, in view of the trial judge's ruling that FDA approval was not required before changing the warnings, Dr. Swanzey's testimony to the effect that it was a trade practice was relevant on the issue of Lederle's reasonableness.
[10] Plaintiff's reply brief does not contest Lederle's assertion that the listed evidence was new evidence in the second trial.
[11] Thus, under the facts in this case, even if the 1965 regulations were in effect in 1962 and Lederle could have warned without advance approval, FDA's rejection of Lederle's proposal would have required Lederle to rescind the warning, at least as to Declomycin. See also, Hurley, 863 F.2d at 1179 on this point.
[12] The proposed warning contained in the FDA letter of April 12, 1963 addressed to Dr. Swanzey of Lederle Laboratories was as follows: "(name of product) may form a stable calcium complex in any bone forming tissue with no serious harmful effects reported thus far in humans. However, use of (name of product) during tooth development (= last trimester of pregnancy, neonatal period and early childhood) may cause discoloration of the teeth (= yellow-grey-brownish). The effect occurs mostly during long-term use of the drug but it has also been observed in usual short treatment courses". In contrast the warning proposed by Lederle on November 16, 1962 read as follows: "During therapy tetracycline may form a stable calcium complex in bone-forming tissue with no known harmful effects. Use of any tetracycline during tooth development in the neonatal period or early childhood may cause discoloration of the teeth."
[13] Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir.1967) is an inadequate warning case involving the drug Aralen consumed by plaintiff between November, 1958 and December, 1962. The opinion assumed, as a given, Sterling's obligation to obtain FDA's prior approval for labeling changes but premised liability on Sterling's failure to act promptly in securing it.
[14] It was in this context that one court had occasion to observe that FDA regulations are "minimal" standards. Stromsodt v. Parke-Davis and Company, 257 F. Supp. 991, 997 (D.N.D. 1966), aff'd 411 F.2d 1390 (8th Cir.1969). The crux of the trial judge's findings of fact was that defendant had obtained FDA approval prematurely based on inadequate testing, and, thus, the FDA's approval was no better than the information on which it was based. See also, Brochu v. Ortho Pharmaceutical Corp., 642 F.2d 652 (1st Cir.1981).