625 A.2d 1066

CAROL ANN FELDMAN, PLAINTIFF-APPELLANT, v. LEDERLE
LABORATORIES, A DIVISION OF AMERICAN CYANAMID
COMPANY, A MAINE CORPORATION DOING BUSINESS IN
THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 1, 1993—Decided June 10, 1993.

*James I. Peck IV* argued the cause for appellant.

*William C. Slattery* argued the cause for respondent (*Norris, McLaughlin* and *Marcus*, attorneys).

PER CURIAM.

We granted certification, 130 *N.J.* 399, 614 *A.*2d 620 (1992), to consider whether the Appellate Division had correctly ordered yet another retrial of this fifteen-year-old action based on errors in the trial court's jury charge. With but one modification we affirm the judgment below substantially on the basis of the Appellate Division opinion. See *Feldman v. Lederle Lab.,* 257 *N.J.Super.* 163, 608 *A.*2d 356 (1992). Our disagreement is limited to so much of that court's opinion as addressed the admissibility of a notation on a letter—the "Swanzey notation."

**I**

Plaintiff's complaint, originally filed in 1978 against Lederle Laboratories, charged that Lederle's tetracycline-based drug Declomycin, which had been administered to plaintiff from her

birth in 1960 until some time in 1965, had permanently discolored her teeth. She contended under a strict-liability theory that the product had been defective as marketed at that time because it had failed to warn that pediatric administrations could cause tooth discoloration. Defendant prevailed at the first trial, and the Appellate Division affirmed in an unpublished opinion. We granted certification, *Feldman v. Lederle Lab.*, 91 *N.J.* 266, 450 *A.*2d 579 (1982), and remanded the cause to the Appellate Division for reconsideration in light of *Beshada v. Johns–Manville Products Corp.*, 90 *N.J.* 191, 447 *A.*2d 539 (1982). The Appellate Division again affirmed, *Feldman v. Lederle Lab.*, 189 *N.J.Super.* 424, 460 *A.* 2d 203 (1983).

We again granted certification, 94 *N.J.* 594, 468 *A.*2d 230 (1983), reversed the judgment, and remanded for a new trial, holding that when a strict-liability defect consists of an improper warning, reasonableness of the defendant's conduct is a factor in determining liability. *Feldman v. Lederle Lab.*, 97 *N.J.* 429, 451, 479 *A.*2d 374 (1984) (*Feldman I*). The question in such cases is whether, assuming that the manufacturer knew of the product's harmful propensities, the manufacturer acted as a reasonably-prudent manufacturer in marketing the product without an adequate warning. *Ibid.* Thus, once the law imputes knowledge to a manufacturer, strict-liability analysis, like negligence, focuses on the reasonableness of a defendant's conduct. *Ibid.*

At the close of the evidence in the second trial in 1985, the trial court denied Lederle's motion to dismiss the complaint on the basis that the claim had been preempted by federal law. The jury returned a verdict for plaintiff on her strict-liability failure-to-warn claim. The verdict form reflected the following findings of fact:

1. Plaintiff ingested Declomycin between 1960 and 1963.

2. There was not a defect in Declomycin based on a failure to warn of tooth discoloration in 1960 and in 1961.

3. There was a defect in Declomycin based on its failure to warn of tooth discoloration in 1962 and in 1963.

4. The failure to warn was a proximate cause of plaintiff's losses and injuries.

5. The conduct of Lederle was not a deliberate act or omission with knowledge of a high degree of probability of harm to the plaintiff and reckless indifference to the consequences.

The finding of "no defect" before 1962 apparently reflects partial acceptance of the testimony of defendant's three experts that the "discoloration" side effect associated with tetracycline was unknowable before that date.

Lederle appealed, renewing its contention that plaintiff's claim based on failure to warn had been preempted by federal laws and regulations governing antibiotic and prescription-drug labeling. Alternatively, Lederle argued that reversal was required because the trial court had erroneously instructed the jury on the applicable law and had made improper evidentiary rulings.

The Appellate Division reversed and remanded for entry of judgment in favor of Lederle on the preemption issue. *Feldman v. Lederle Lab.*, 234 *N.J.Super.* 559, 564, 561 *A.*2d 288 (1989). In doing so, the court noted:

Our failure to address the alternative issues should not be understood to mean that they have no merit. Indeed, we perceive several errors in the jury instructions and evidentiary rulings which, but for our ruling on preemption, would require a reversal and new trial. [*Id.* at 564 n. 3, 561 *A.*2d 288.]

We again granted certification, 122 *N.J.* 348, 585 *A.*2d 360 (1990), and held that under the Supremacy Clause, *U.S. Const.* art. VI, cl. 2, federal law had not preempted plaintiff's strict-liability cause of action based on failure to warn: in short, Lederle could have warned about the possibility that Declomycin caused tooth discoloration without violating federal law during the time period in which plaintiff alleged injury. *Feldman v. Lederle Lab.*, 125 *N.J.* 117, 122, 592 *A.*2d 1176 (1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 3027, 120 *L.Ed.*2d 898 (1992) (*Feldman II*). We remanded to the Appellate Division to consider those issues previously raised on defendant's appeal but not decided.

Holding true to its prediction, see 234 *N.J.Super.* at 564 n. 3, 561 *A.*2d 288, n. 3, the Appellate Division reversed and remanded for a new trial. 257 *N.J.Super.* at 178, 608 *A.*2d 356.

## II

The Appellate Division found three bases for reversal in the trial court's jury charge. We agree with its reasoning in each instance.

At the outset of our analysis, we pause to acknowledge the concerns of our dissenting colleagues who remind us of the dangers of reading isolated portions of a jury charge out of context. See *post* at 350–352, 625 *A.*2d at 1071–1072. We are mindful that "[r]eversible error will not be found where the charge, considered as a whole, adequately conveys the law and would not confuse or mislead the jury, even though part, standing alone, might be incorrect." *Latta v. Caulfield,* 79 *N.J.* 128, 135, 398 *A.*2d 91 (1979) (citing *Jurman v. Samuel Braen, Inc.,* 47 *N.J.* 586, 592, 222 *A.*2d 78 (1966); *Stackenwalt v. Washburn,* 42 *N.J.* 15, 26–27, 198 *A.*2d 454 (1964)). We note further that the charge, as a whole, must be analyzed "under the evidence and circumstances of the trial." *Fitzmaurice v. Van Vlaanderen Mach. Co.,* 110 *N.J.Super.* 159, 164, 264 *A.*2d 740 (App.Div.1970), *aff'd,* 57 *N.J.* 447, 273 *A.*2d 561 (1971).

However, unlike our dissenting colleagues, we further recognize other equally-important principles bearing on the issue of prejudicial error in a jury charge. First, statements delimiting the duty owed by a party in a strict-liability failure-to-warn case involving complicated issues of causation, proof, and preemption should, in the interests of justice, be unmistakably clear. *See Eden v. Conrail,* 175 *N.J.Super.* 263, 278, 418 *A.*2d 278 (App.Div.1980), *modified,* 87 *N.J.* 467, 435 *A.*2d 556 (1981); *Phillips v. Scrimente,* 66 *N.J.Super.* 157, 162, 168 *A.*2d 809 (App.Div.1961). Second, firmly entrenched in our law is the principle that conflicting or inconsistent statements in a jury charge do not magically counteract each other to produce a

correct jury instruction; otherwise-reversible error dissipates only if the erroneous portions of the charge are expressly withdrawn by the trial court. *See, e.g., Jelinek v. Sotak,* 9 *N.J.* 19, 22–24, 86 *A.*2d 684 (1952) (finding reversible error when court first instructed that train engineer had duty to stop at crossing and then instructed that he was obliged only to use reasonable care at crossing); *Girardin v. New York & Long Branch R.R.,* 135 *N.J.L.* 135, 138, 50 *A.*2d 872 (E. & A.1947); *Horton v. Smith,* 128 *N.J.L.* 488, 489, 27 *A.*2d 193 (E. & A.1942); *Price v. Phillips,* 90 *N.J.Super.* 480, 485, 218 *A.*2d 167 (App.Div.1966); *Davidson v. Fornicola,* 38 *N.J.Super.* 365, 371, 118 *A.*2d 838 (App.Div.1955), *certif. denied,* 20 *N.J.* 467, 120 *A.*2d 275 (1956); *Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer District Auth.,* 34 *N.J.Super.* 478, 518–19, 112 *A.*2d 762 (App.Div.1954), *modified,* 18 *N.J.* 294, 113 *A.*2d 787 (1955); *cf. Mohr v. B.F. Goodrich Rubber Co.,* 147 *N.J.Super.* 279, 285, 371 *A.*2d 288 (App.Div.1977) (finding that clearly erroneous portion of strict-liability charge in which "and" was substituted for "or" did not compel reversal because methods of proving strict liability were explained clearly throughout course of trial so as to render charging error minor non-prejudicial inaccuracy), *certif. denied,* 74 *N.J.* 281, 377 *A.*2d 685 (1977).

██ We turn now to the three points of error in the charge. First, the Appellate Division held that the trial court had improperly charged the jury regarding the relevancy of Lederle's decision to seek Food and Drug Administration (FDA) approval before issuing new warnings about the possibility of tooth discoloration. The Appellate Division's holding, that the instruction in question effectively directed a verdict for plaintiff, keys in on the trial court's statement that "the defendant still owes a duty to warn its users in the exercise of reasonable care." That part of the charge was erroneous and contributed to the verdict; indeed, it bears directly on the critical liability issue in the case.

The trial court's error lay in telling the jury outright that Lederle had a "duty to warn." Because the jury heard evidence that Lederle had not incorporated a tooth-discoloration warning until late 1963, it could have reached no conclusion other than that Lederle had breached a legal "duty to warn." The charge effectively told the jury that as a matter of law, defendant had not exercised reasonable care by attempting only to comply with FDA regulations without issuing its own warning. The language in the charge immediately following that excerpted above, which informs the jury that it may consider Lederle's correspondence with the FDA during the relevant period on the issue of the reasonableness of the company's decision not to warn until late 1963, becomes meaningless. The damage had already been done.

The jury must decide whether Lederle breached a duty of reasonable care by failing to warn of a known danger in its product—in other words, whether the product was defective for failure to warn at a given time. We reiterate what we stated in *Feldman I:* the manufacturer's duty on learning of Declomycin's dangerous side effects was to warn "as soon as reasonably feasible," and once knowledge of the danger is imputed to the manufacturer, the focus is on the reasonableness of defendant's conduct, just as in an ordinary negligence case. *Feldman I, supra,* 97 *N.J.* at 451, 456, 479 *A.*2d 374. Lederle's duty to warn may not have arisen until late 1963, if that is when a reasonable manufacturer would have acted. The charge left no room for the permissible finding Lederle did not have a duty to warn above and beyond FDA compliance until 1963, and that its decision not to warn was reasonable.

Even though we held in *Feldman II, supra,* 125 *N.J.* at 147, 592 *A.*2d 1176, that as a matter of law nothing in the federal statutes and regulations prevented Lederle from placing a warning on Declomycin while awaiting FDA approval in 1962 and 1963, Lederle's attempt to comply with existing FDA regulations still bears on the reasonableness of its conduct. The fact issue for the jury was whether a reasonable drug

manufacturer with the same knowledge Lederle had in 1960 to 1963 would have placed a tooth-discoloration warning on Declomycin packaging in addition to corresponding with the FDA. In that light, the FDA regulations were simply "minimum standards"—compliance with them was mandatory, but they did not preclude Lederle from taking additional action. See *Feldman II, supra,* 125 *N.J.* at 117, 592 *A.*2d 1176 (holding that although federal law still applied to Lederle, it did not prevent placing of additional warnings on drug packaging); *Feldman I, supra,* 97 *N.J.* at 461, 479 *A.*2d 374 (citing cases holding that FDA regulations are minimum standards); *Duffy v. Bill,* 32 *N.J.* 278, 291–93, 160 *A.*2d 822 (1960) (holding that once trial court finds sufficient evidence to warrant submission of question, jury must decide fact issue of whether reasonable care requires warnings in addition to what is called for by statute); *McQuaid v. Burlington County Memorial Hospital,* 212 *N.J.Super.* 472, 475–76, 515 *A.*2d 796 (App.Div.1986) (stating that although manufacturer's compliance with FDA request to remove part of warning label may not have provided absolute defense, that decision was clearly relevant to reasonableness of its conduct); *Hatfield v. Sandoz–Wander, Inc.,* 124 *Ill.App.*3d 780, 80 *Ill.Dec.* 122, 126, 464 *N.E.*2d 1105, 1109 (1984) (holding that evidence of FDA compliance in strict-liability failure-to-warn cases is relevant and not overly prejudicial); *Hines v. St. Joseph's Hospital,* 86 *N.M.* 763, 765, 527 *P.*2d 1075, 1078, *cert. denied sub nom. Hines v. Blood Services, Inc.,* 87 *N.M.* 111, 529 *P.*2d 1232 (1974) (holding that compliance with federal regulations could be used to show that defendant had acted with due care under circumstances); *O'Gilvie v. International Playtex, Inc.,* 821 *F.*2d 1438, 1442 (10th Cir.1987) (charging that "if you find that defendant * * * met all government regulations and requirements, which are minimum standards, such compliance is not a defense if a reasonable and prudent manufacturer would have taken added precautions"), *cert. denied,* 486 *U.S.* 1032, 108 *S.Ct.* 2014, 100 *L.Ed.*2d 601 (1988); *Restatement (Second) of Torts* § 288C (1965).

The second error in the charge was that the trial court misstated defendant's burden of proof when it instructed the jury that it could find for Lederle if the company had "met its burden of proving that it [had] acted as a reasonably prudent manufacturer in distributing Declomycin between 1960 and 1963 * * *." The trial court seems to have melded concepts of knowledge and reasonableness. The trial court's assignment to Lederle of the burden to prove reasonableness, and Feldman's statement, in her supplemental brief in the Appellate Division, that "unless defendant demonstrated that * * * [it did not have] knowledge of the harmful propensity of Declomycin * * *, it fell short of establishing the reasonableness of its conduct to a legal sufficiency," evidences their confusion. We have speculated on the possibility that their positions stem from an inaccurate interpretation of our statement in *Feldman I*, that "generally conduct should be measured by knowledge at the time the manufacturer distributed the product." 97 *N.J.* at 452, 479 *A.*2d 374.

Whatever the genesis of the error, knowledge and reasonableness are clearly separate questions, and a shift of the burden to rebut the imputation of knowledge does not shift the burden to prove reasonableness of conduct. In *Feldman I*, we shifted the burden to defendant to prove only that it had lacked the actual or constructive knowledge of its product's defect otherwise imputed to it by law. 97 *N.J.* at 455–56, 458, 479 *A.*2d 374. *Feldman I* directed that once knowledge is imputed to the manufacturer, the analysis then focuses on the reasonableness of defendant's conduct. *Id.* at 451, 479 *A.*2d 374. *Feldman II*, in reviewing defective-product law, similarly instructed that the issue was whether the manufacturer had known of the danger, and *"if so, whether"* it had acted reasonably. 125 *N.J.* at 144, 592 *A.*2d 1176 (emphasis added). Clearly the process requires two steps, the second step being functionally equivalent to a negligence analysis in which the burden does not shift to defendant, and the reasonableness of the manufacturer's conduct given its knowledge is at issue. In an

ordinary negligence case, the plaintiff bears the burden of showing the unreasonableness of the defendant's conduct (in other words, the defendant's breach of a duty owed). *Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc.*, 53 *N.J.* 157, 161, 249 *A*.2d 382 (1969); *Long v. Landy*, 35 *N.J.* 44, 54, 171 *A*.2d 1 (1961).

■ The third error in the charge lies in the trial court's failure to instruct the jury properly on the issue of damage apportionment. Not only should the court have tailored its general causation instruction more closely to the facts of the case and the proofs adduced, but it should have specifically instructed the jury to apportion damages caused by the administrations of the product only in those years in which it found the product to have been defective. *See Scafidi v. Seiler*, 119 *N.J.* 93, 102, 574 *A*.2d 398 (1990) (stating that in such contexts standard by which jury evaluates causation must be expressed in terms consistent with operative facts); *Campos v. Firestone Tire & Rubber Co.*, 98 *N.J.* 198, 210, 485 *A*.2d 305 (1984) (stating that strict-liability charge should be tailored to factual situation to assist jury in performing its fact-finding responsibility). Owing to the complexity of this case, the standard proximate-cause charge given could have easily confused or misled the jury into awarding damages for all of plaintiff's injuries if it found Declomycin defective in any one year.

Our decision in *Ostrowski v. Azzara*, 111 *N.J.* 429, 545 *A*.2d 148 (1988), presents an analogy. In *Ostrowski*, a medical-malpractice case, the jury had to consider the plaintiff's pre-treatment health condition and post-treatment conduct in assessing whether the defendant's negligent medical treatment had proximately caused the plaintiff's injuries. *Id.* at 448, 545 *A*.2d 148. The trial court's interrogatories asked only whether the plaintiff's failure " 'to exercise that [reasonable] degree of care for her own safety and well-being' was 'a proximate cause of her injuries *and* damages.' " *Ibid.* (quoting interrogatories). We found that interrogatory improper because, among other

things, it "did not adequately separate or define the concepts that were relevant to the disposition of the plaintiff's case"; "did not specifically cordon off the jury's consideration * * * to either the pre-treatment period or the post-treatment period"; and "did not distinguish between the patient's pre-operative and post-operative conduct." *Id.* at 448–49, 545 *A.*2d 148.

Similarly, in this case the trial court's general instruction on proximate cause and jury interrogatory number three (which asked simply whether the failure to warn had been a proximate cause of plaintiff's injuries and losses) did not allow the jury an opportunity to find that all or part of plaintiff's damages had been caused by pre–1962 and post–1963 administrations of Declomycin. Notably, the trial court in *Ostrowski* made a greater effort to tailor its instructions to the facts of the case than did the trial court in the case before us, despite which we found error. See *ibid.*

The dissent argues that the jury award reflects a rational conclusion, supported by the evidence, that Lederle's failure to warn in 1962 and 1963 proximately caused $300,000 worth of injuries to plaintiff's teeth. See *post* at 373–376, 625 *A.*2d at 1083–1085. However, that most substantial award is more reasonably seen as reflecting the jury's confusion on how properly to apportion damages for only those injuries caused by defendant's failure to warn. Our interpretation is informed by those portions of the record suggesting that most of plaintiff's damages were caused early in the period in which liability is alleged and for which the most accurate dosage and administration data are available.

The trial court should have specifically instructed the jury to apportion damages for only those harms caused by administrations of Declomycin during which it found the product defective for a failure to warn. Although retrial will be limited to liability for 1962 and 1963, the jury must be instructed to apportion damages for pre–1962 and post–1963 administrations of Declomycin if it finds that those caused plaintiff's damages.

Because the point of administration of the drug within each year assumes significance, the trial court might consider breaking each year down into smaller units of time, especially within 1962 and 1963.

In sum, we conclude that each point of error, standing alone, could potentially warrant retrial. When considered in combination, those errors had the cumulative effect of rendering the charge capable of confusing, misleading, and otherwise prejudicing the jury. *See Borowicz v. Hood,* 87 *N.J.Super.* 418, 424, 209 *A.*2d 655 (App.Div.) (finding that "cumulative effect" of multiple errors in charge mandated reversal and retrial even though some of those errors did not constitute plain error), *certif. denied,* 45 *N.J.* 298, 212 *A.*2d 170 (1965).

### III

The Appellate Division further commented on other deficiencies in the charge, which, although not warranting reversal, should nevertheless be corrected at retrial. 257 *N.J.Super.* at 174, 608 *A.*2d 364. The court below ruled that on retrial Lederle would be permitted to call its expert witness, Dr. Goddard, who had not been allowed to testify as an expert or as a fact witness because his report had not been furnished to plaintiff on time and because he had lacked personal knowledge of the facts relevant to the time periods in question. *Id.* at 176–77, 608 *A.*2d 364. The court also limited retrial to Lederle's liability in 1962 and 1963 only, and for compensatory damages during those years. *Id.* at 177, 608 *A.*2d 364. We approve of the court's instructions and findings on those issues.

However, we part company with the court below in its decision to classify the notation made by Dr. Swanzey, then director of Regulatory Agencies Relations at Lederle, on a letter from Dr. Barzilai, Medical Officer in the Division of Antibiotic Drugs at the FDA's Bureau of Medicine, as admissible hearsay under *Evidence Rule* 63(13), the "business entries" exception. See *ibid.*

Dr. Swanzey testified that he had received a letter dated December 3, 1962, from Dr. Barzilai. At about the time the letter was sent, the two men had a phone conversation. Immediately after he received Barzilai's letter, Swanzey noted the substance of that phone conversation on the bottom of the letter in his own handwriting, followed by his initials. That notation reads:

Telephone conversation with Barzilai, December 4. He advised against putting any statement in circular. He is studying this matter and will call a meeting after the holidays with interested parties. E.H.S.

Plaintiff did not object to the typed portions of the letter, but twice objected to the handwritten portions as inadmissible hearsay. The trial court ruled that

the notations on correspondence that result from a telephone conversation do not in any way constitute business records * * *. In fact, * * * that's certainly an out of court statement that's being admitted for the truth and I am satisfied that it does not fit within the category of exceptions to the hearsay rule * * *.

The Appellate Division reversed, stating that

[t]he evidence was offered to show why Lederle did not issue a warning at that time. Dr. Swanzey was a witness in the case and subject to cross-examination. In our view, he established the requisites of admissibility under Evidence Rule 63(13). While we are not satisfied that this error, standing alone, was capable of affecting the result, we hold that on retrial the notation should be admitted with the letter on which it was written. [257 N.J.Super. at 177, 608 A.2d 364 (citation omitted).]

We agree that the exclusion of the notation did not affect the result in this case. The letter on which Swanzey penned his note communicated a similar message and was admitted into evidence. In that letter Dr. Barzilai acknowledged receipt of Dr. Swanzey's correspondence of November 16, 1962, proposing a new warning statement for all oral and parenteral tetracycline products concerning reports that those products might cause tooth discoloration. He then informed Dr. Swanzey that the FDA was in the process of investigating the matter, and that Dr. Swanzey would be notified when a conclusion had been reached.

However, Dr. Swanzey's notation is not admissible as a business entry under *Evidence Rule* 63(13). Under *Evidence*

*Rule* 63, hearsay is "[e]vidence of a statement offered to prove the truth of the matter stated which is made other than by a witness while testifying at the hearing * * *." All hearsay is inadmissible unless it falls within a recognized exception under *Evidence Rules* 63(1) to 63(33).

██ The requisites for admissibility under that rule are: First, the writing must be made in the regular course of business. Second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence. [*State v. Matulewicz*, 101 *N.J.* 27, 29, 499 *A.*2d 1363 (1985).]

██ The Appellate Division incorrectly concluded that Swanzey's testimony had met those requirements. After having Swanzey read his notation to the trial court, Lederle's attorney examined him as follows:

Q. And did you make that notation at the time of telephone conversation or immediately thereafter?

A. I made it immediately thereafter upon receipt of this letter which crossed in the mail. When I received the letter I put the notation on it immediately.

MR. MELHUISH: When you made that notation, sir, was it a notation you entered as to facts that you knew and understood to be true when you wrote them and in the ordinary course of business in your responsibility as you have described for the Lederle Laboratories?

THE WITNESS: Yes, sir.

Moreover, Lederle argued that as a business record, the notation was just as admissible under *Evidence Rule* 63(13) as the laboratory-research reports that had been received in evidence.

However, unlike lab reports, the Swanzey notation lacks sufficient indicia of trustworthiness and reliability normally found in business records. Even records that are properly kept and have the required circumstantial probability of trustworthiness are not admissible if " 'the trial court, after examining them * * * and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence.' " *Matulewicz, supra,* 101 *N.J.* at 30, 499 *A.*2d 1363 (quoting *Mahoney v. Minsky,* 39 *N.J.* 208, 218, 188 *A.*2d 161 (1963)). Such doubts clearly exist where, as

here, the alleged "business entry" is an informal, handwritten note on the bottom of a piece of correspondence.

Other than Swanzey's statement that he had made the notation in the ordinary course of business, the record contains no evidence that he had regularly kept, or had been under a duty to keep, written memorializations of his phone conversations with persons on letters sent by those persons, or that he had ever engaged in a regular practice of memorializing his phone conversations at the time he made the notation on Barzilai's letter. Swanzey made no similar notations on any of the other correspondence either sent or received by him included in the appendices to the Appellate Division brief. Comment 2 to *Evidence Rule* 63(13) instructs that "[p]roof that entries comparable to the one at issue were usually made at or about the time of the event recorded should be sufficient." No such proof was adduced, nor was any necessity to keep such records demonstrated. *Phoenix Assocs. v. Edgewater Park Sewer Auth.*, 178 *N.J.Super.* 109, 116, 428 *A.*2d 508 (App.Div.1981), *aff'd*, 89 *N.J.* 2, 444 *A.*2d 51 (1982). Thus, because no independent check exists on the veracity of the statements made in the notation other than Swanzey's word, the notation is not admissible as a business entry under *Evidence Rule* 63(13).

## IV

The judgment of the Appellate Division is modified and, as modified, affirmed.

HANDLER, J., dissenting.

Today, the Court intervenes for the third time in a case filed some fifteen years ago. In 1978, plaintiff brought this action against defendant, a drug manufacturer, for injuries she sustained as a child from the use of defendant's product, Declomycin, a tetracycline-type antibiotic. To date, this litigation has included two jury trials, three opinions by the Appellate Division, and two opinions by this Court. The Court's decision,

finding the jury instructions at the second trial so deficient as to warrant a third trial, guarantees yet another full round of litigation and indefinitely forestalls relief to a clearly wronged claimant.

Because I am convinced that the trial court's instruction when taken as a whole was not so erroneous as to prejudice defendant and the result of the jury trial was not manifestly unjust, I dissent from that part of the Court's decision that deals with the charge to the jury.

## I

The Court bases its order for a retrial on three different errors it finds in the jury instruction. Those errors are: first, that the trial court improperly charged the jury on defendant's duty to warn of the defect in its product; second, that the trial court "misstated the defendant's burden of proof" in its charge to the jury; and third, that the trial court failed "to instruct the jury properly on the issue of damage apportionment." None of those errors, I would contend, taken separately or together, constitutes error so egregious as to state the law in such a manner that jurors would fail to understand the instructions or be unable correctly to apply the law. *See Stackenwalt v. Washburn*, 42 *N.J.* 15, 26, 198 *A.*2d 454 (1964).

## A.

Throughout the long lifetime of this litigation, plaintiff has twice been compelled to present proof of defendant's failure to warn. Commenting on the proofs presented in the first trial, we noted in *Feldman v. Lederle Labs.*, 97 *N.J.* 429, 479 *A.*2d 374 (1984) (*Feldman I*), that "the evidence is overwhelming that at least by mid-November, 1962, defendant had sufficient information to warrant that it warn doctors of the possible tooth discoloration effects of Declomycin when administered to infants." *Id.* at 463, 479 *A.*2d 374. We further noted that by 1962 defendant's awareness of the dangers of Declomycin

"went beyond the stage of suspicion." *Id.* at 464, 479 *A.*2d 374. Referring to the years 1962 and 1963—the time for which the jury in the case now before the Court found defendant liable for its failure to warn—the Court noted, "Insofar as that period of time is concerned, a jury determination based on defendant's lack of knowledge would be 'a miscarriage of justice under the law.'" *Ibid.* (quoting *Rule* 2:10–1). The evidence presented, by plaintiff, at the second trial was substantially the same as that she had presented at the first trial.

As at the first trial, the jury heard evidence of the deliberate targeting of the pediatric market by defendant, and the way in which defendant had distributed, to physicians like plaintiff's father, complimentary samples of Declomycin, packaged as a cherry flavored syrup dispensed from a clown shaped bottle, in order to appeal to that market. As at the first trial, the jury heard the testimony of Dr. Swanzey, a twenty-eight year employee of defendant, who testified that as early as 1960 defendant had been in possession of scientific studies noting pediatric tooth staining from ingestion of tetracycline products like Declomycin. Because the studies dealt with children who suffered from cystic fibrosis, defendant claimed that it could not decide that children who did not suffer from that disease would be similarly affected.

Defendant, however, never undertook a comparative study to determine whether the tooth discoloration was a product of the disease or of the pediatric use of tetracycline products. Nor did defendant communicate with doctors, to whom it was aggressively promoting tetracycline products like Declomycin, to inform them of the studies or even to warn those doctors of the dangers of tetracycline products for their pediatric patients who suffered from cystic fibrosis. Instead, defendant remained absolutely silent about the information it had at its disposal. As Justice Clifford parenthetically remarked in *Feldman v. Lederle Labs.*, 125 *N.J.* 117, 592 *A.*2d 1176 (1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 3027, 120 *L.Ed.*2d 898 (1992) (*Feldman II*). "The record is conspicuously silent on any

continuing efforts by [defendant] to confirm the association of Declomycin with tooth staining or to gain FDA sanction of a warning for Declomycin." *Id.* at 153, 592 *A.*2d 1176 (citing to *Feldman I*).

As at the first trial, the jury was presented with evidence of three of defendant's own studies, each of which conclusively demonstrated discoloration of bone matter and teeth in experimental animals that had ingested Declomycin. In one of those studies, one group of test animals was given one-percent Declomycin, while the control group did not receive the drug. As Dr. Swanzey verified at trial, the report concluded: "The bones of all animals from the one percent group were found to be yellow at autopsy * * *. Bones of all other control animals were normal."

The sources of defendant's knowledge about the disfiguring side effects of Declomycin were not limited to studies produced by its own or other scientists. Defendant's own sales representatives were reporting anecdotal evidence of Declomycin's role in tooth discoloration. A letter from one sales representative, dated December 26, 1962, read:

> Just my second day back and a dentist caught me on Declo (Declomycin) and Tetracycline causing darkening of teeth.... [H]e stated that he has an eight-year old girl patient who has just had her teeth turned color gray. She had been on Tetracycline when she was about one to two years old and no discoloration of teeth took place until now, six years later.

Earlier, in August of 1962, defendant's sales manager in Long Beach, California, had issued a memorandum to its sales representatives noting that defendant was "beginning to hear comments about the yellowing discoloration of teeth in children following tetracycline therapy."

Defendant's response to that evidence came in April 1963, when it sent a memorandum to its sales representatives explaining an enclosed set of warnings to be inserted on all its tetracycline products, *except* Declomycin. In explaining that exception, defendant wrote to its sales representatives:

> You will note that Declomycin is not included in the list of tetracycline analogues involved in this current revision. Therefore, the inserts and stickers (which contained the warning) are *not* to be attached to Declomycin circulars and literature. *While Declomycin has not been officially implicated with tooth staining, it probably will be within a short period of time,* therefore, any gain by making an issue of this fact would rebound unfavorably at a later date. *In the meantime, in answer to any questions from a doctor concerning Declomycin and tooth staining, your answer is "Declomycin has not yet been officially implicated in tooth staining."* [emphasis added.]

As Justice Clifford noted for the Court in *Feldman II, supra,* "The answer to be given inquiring physicians can be described accurately as evasive." 125 *N.J.* at 127, 592 *A.*2d 1176.

Faced with that mountain of incriminating evidence, particularly for the years 1962 and 1963, defendant rested its case almost entirely on one argument: the FDA regulations in existence at the time prohibited it from issuing a warning without FDA approval. Despite the fact that the Court indicated its rejection of that interpretation of the regulations in *Feldman I, supra,* 97 *N.J.* 458–62, 479 *A.*2d 374, defendant effectively mounted the same defense in its second trial. As the Appellate Division noted, defendant offered as its "primary defense in this case ... that, irrespective of its knowledge in November 1962, it had, in the context of the federal regulatory scheme to which it was subject, acted as a reasonably prudent manufacturer by informing the FDA and requesting permission to change its warnings." *Feldman v. Lederle Labs.,* 257 *N.J.Super.* 163, 167, 608 *A.*2d 356 (1992). In *Feldman II,* the Court spoke more definitively on the impact of the FDA regulations on defendant's ability to place a warning on Declomycin. There, the Court found that FDA regulations did not prohibit defendant from placing additional warnings on Declomycin without FDA approval. 125 *N.J.* at 153, 592 *A.*2d 1176.

In the face of those decisions, defendant has held steadfast to its defense, continuing to rely on the argument that the FDA regulations had prevented it from issuing a warning. The Appellate Division, for its part, appears to have been strongly influenced by defendant's disingenuous argument, giving in its

opinion only the most begrudging recognition to our decision in *Feldman II,* which had decisively rejected that argument.

The trial court charged the jury on the significance of FDA regulations to defendant's duty to warn. In relevant part that charge stated:

> Now for legal reasons, with which you need not concern yourselves, this Court has ruled that the defendant, Lederle Laboratories, was not required to obtain the prior approval of the Federal Food and Drug Administration before issuing a warning concerning the side effect of tooth discoloration in Declomycin between 1960 and 1963. The Federal Food and Drug Administration regulations and requirements are minimal standards and the defendant still owes a duty to warn its users in the exercise of reasonable care. However, the exchange of correspondence and other communications between the Federal Food and Drug Administration and the defendant, Lederle Laboratories, have been admitted into evidence and may be considered by you on the issue of the reasonableness of defendant's conduct.

Commenting on that part of the instruction, the Appellate Division concluded that the trial court had effectively resolved for the jury the issue of whether defendant had acted reasonably in not issuing a warning before receiving FDA approval. *Feldman, supra,* 257 *N.J.Super.* at 169, 608 *A.*2d 356. The Court, in an uncharacteristic manner, accepts that narrow perception of the impact of the instruction.

I do not believe that rendition of the instruction is either sound or fair. The first sentence of the trial court's instruction is, in light of *Feldman I* and *Feldman II,* assuredly an accurate statement of the law. The trial court correctly informed the jury that the Food and Drug Administration (FDA) regulations in existence at the time of plaintiff's injury did not bar defendant from issuing warnings about the dangers of Declomycin. It is, therefore, troublesome that the Appellate Division twice states that *if* the trial court was incorrect in its understanding of the regulations *then* the instruction was erroneous. But the trial court's understanding of the regulations—that "federal regulations did not require prior FDA approval" 257 *N.J.Super.* at 168, 608 *A.*2d 356—is surely correct. The Appellate Division's conclusion, that the jury instruction on this point was

erroneous, failed to give full effect to the holding of *Feldman II.*

The Appellate Division noted that, in its earlier decision, *Feldman v. Lederle Labs.,* 234 *N.J.Super.* 559, 561 *A.*2d 288 (1989), it had held that defendant had faced suspension of its new drug application if it placed a tooth discoloration warning on Declomycin and the drug later turned out not to have the tooth discoloring side effect. "The dilemma was that [defendant] believed the proposed new warning to be true, but the FDA correspondence evidenced the agency belief that the proposed warning was inaccurate." *Feldman, supra,* 257 *N.J.Super.* at 169, 608 *A.*2d 356. (In fact the record does not demonstrate a belief on the part of the FDA that the information gathered by Lederle was "inaccurate," only that it may not have been sufficiently substantiated.) The Appellate Division concludes that "even in the absence of preemption * * * even assuming federal regulations [could] be read to allow [defendant] to change the warning prior to FDA approval," the issue for the jury was "whether the correspondence from the FDA was sufficient evidence to justify [defendant's] decision to withhold a warning until such time as the FDA was convinced otherwise." *Ibid.*

As I discuss later, in treating the issue of reasonableness, by those statements the Appellate Division may have meant that the jury was to assess whether defendant, faced with the FDA's opinion that a warning was not yet required on Declomycin, had acted reasonably in not issuing such a warning. Critical to such an assessment would be the fact that defendant had access to information, from its own studies and from the anecdotal reports of its sales representatives, about the side effects of Declomycin that was not available to the FDA. Whatever the explanation or cause, the Appellate Division's opinion gives the most constricted reading to *Feldman II* and, in so doing, misses the import of that holding on plaintiff's case.

The Appellate Division holds to the idea that defendant was faced with some sort of "dilemma" in which it would be punished if it changed the warning without FDA approval, despite this Court's express rejection of that notion in *Feldman II,* 125 *N.J.* at 153, 592 *A.*2d 1176. The record indicates that the FDA's opinion was that the evidence of Declomycin's detrimental side effects was not yet sufficient, *based on the FDA's knowledge,* to require a warning. That circumstance is far different from the FDA affirmatively challenging evidence that Declomycin was discoloring the teeth of children to whom it was administered. No suggestion appears in the record that the FDA itself believed that the information was false (as opposed to being insufficiently substantiated) or that it even remotely contemplated administrative prosecution of Lederle if it issued a warning that was based on the information then available. On that point, note that the jury heard evidence that defendant believed that the FDA would soon come to the conclusion that Declomycin disfigured the teeth of young children. What else could defendant have meant by its instructions to its sales representatives that Declomycin would be "officially implicated" in tooth staining "within a short period of time." *Supra* at 359, 625 *A.*2d at 1076. What was the "official" body that could implicate Declomycin in tooth discoloration? Clearly defendant could only have meant the FDA. The unavoidable conclusion is that defendant was convinced that the FDA would soon find Declomycin to require a warning about tooth discoloration. That conclusion renders even more disingenuous defendant's contention that the refusal of the FDA to require a warning was behind its own failure to warn.

The Appellate Division thus posits a scenario in which defendant, conscientiously seeking to protect its consumers by giving them fair warning, is threatened by a hard-nosed and punitive agency, and ultimately foregoes its altruistic intent. The court does not seem to consider the more plausible explanation of the situation—that defendant, anxious to preserve its market and enhance its profits in the face of highly disturbing countervail-

ing evidence, simply tried to hide behind the FDA's own current unpreparedness to authorize the issuance of a more protective warning—"Declomycin," in Lederle's own words, "has not yet been *officially implicated* in tooth staining." (emphasis added).

The Court, nevertheless, endorses the Appellate Division's interpretation of *Feldman II*. It does so by focusing exclusively on the second sentence of the quoted instruction. That narrow concentration causes the Court to observe that "[t]he trial court's error lay in telling the jury outright that [defendant] had a 'duty to warn.'" *Ante* at 358, 625 *A*.2d at 1075. Thus, the Court concludes, the trial court "effectively told the jury that as a matter of law, defendant had not exercised reasonable care by attempting only to comply with FDA regulations without issuing its own warning." *Ante* at 359, 625 *A*.2d at 1076. The fact is that the sentence does *not* tell the jury "outright" that defendant had a duty to warn despite reliance on the FDA's view of the side effects of the drug. The Court's construction assumes that the jury was directed by this single sentence to disregard the evidence relating to the FDA–Lederle correspondence and exchanges. In drawing its conclusion the Court imputes to the entire charge the purported defect of a single sentence. To sustain that imputation the Court is compelled to ignore the rest of the jury charge and to dismiss as "meaningless" subsequent aspects of the charge that resist that imputation. Such a reading of a jury charge is entirely at odds with our prior case law.

This Court has held consistently that in determining whether a jury charge is erroneous, one aspect, let alone one sentence, of the charge cannot be read in isolation from the rest of the charge. See, *e.g.*, *Latta v. Caufield*, 79 *N.J.* 128, 135, 398 *A*.2d 91 (1979); *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A*.2d 608 (1973); *State v. Council*, 49 *N.J.* 341, 342, 230 *A*.2d 383 (1967); *Stackenwalt, supra*, 42 *N.J.* at 26–27, 198 *A*.2d 454; *State v. Hipplewith*, 33 *N.J.* 300, 317, 164 *A*.2d 481 (1960). The Court has recognized that "[i]t is ordinarily impossible for the trial

court to state all of the applicable law in one sentence," *Hipplewith, supra,* 33 *N.J.* at 317, 164 *A.*2d 481, and, accordingly, the Court looks to the charge in its entirety to see if the jury was misled. *Ibid.* The test the Court applies is "how and in what sense, under the evidence, would jurors understand the instructions as a whole * * *." *Stackenwalt, supra,* 42 *N.J.* at 27, 198 *A.*2d 454.

That standard of review is grounded both in the realities of trial court practice and in common sense. A trial court, particularly in complex litigation such as that involved in this case, bears a heavy burden to instruct the jury properly. Fixating on a single sentence, taken entirely out of context, and against evidence that realistically neutralizes the literal effect of that sentence, virtually guarantees that every jury charge will be found wanting. Common sense would dictate that a single excerpt, ripped from its setting within the entire charge, cannot possibly determine whether the charge as a whole correctly conveyed the relevant law.

Judge Learned Hand observed almost fifty years ago, "There is no surer way to misread any document than to read it literally...." *Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944) (Hand, J., concurring). Daring to take exception with the great jurist, I would observe that the Court today shows the inaccuracy of Hand's maxim: a *surer* way to misread a document than taking it literally is to take a part of that document, out of context, and read it literally. In this case, however, we are not even faced with a written document. Rather, the Court is presented with a transcript of an oral communication, a transcript that, invariably, omits the inflection and pacing with which emphasis is given to spoken words. One may doubt very much that the jury heard the challenged instructions the way in which the Court now reads them.

In order to sustain its noncontextual reading of a single sentence of the jury charge, the Court is forced to discard the language that immediately follows the allegedly erroneous sen-

tence. That language, the Court concedes, "informs the jury that it may consider [defendant's] correspondence with the FDA during the relevant period on the issue of reasonableness of the company's decision not to warn until late 1963." *Ante* at 347, 625 *A*.2d at 1070. The Court concentrated exclusively on a single sentence of the charge, disregarding the language that was completely in keeping with our holding in *Feldman II* as "meaningless." *Ante* at 347, 625 *A*.2d at 1070.

A much more plausible reading—a *contextual* reading—of that language is that even when defendant complies with federal regulations, the jury must *still* consider whether it has satisfied its duty to warn, not that it *must* conclude that it has not satisfied that duty. Thus, the jury may consider that defendant has not necessarily exhausted its duty to act with reasonable care simply by adhering to federal regulatory standards. Rather, the factor of compliance with federal regulations is one aspect of the evidence relevant to whether defendant met its duty to warn. Thus, mere compliance with federal regulations alone may, but does not necessarily, discharge completely a defendant's duty to warn. On this view, the language that the Court dismissed as "meaningless" makes perfect sense when read in conjunction with the sentence that preceded it: the jury was to assess the various communications between the FDA and defendant in evaluating whether, based on defendant's knowledge of the product, a warning had become reasonably necessary.

The Court, protesting that it recognizes the importance of reading the jury charge in context, *ante* at 345, 625 *A*.2d at 1069, implies that that imperative is overcome by the need for "unmistakably clear" instructions on the duty to warn in strict liability cases, and the "principle that conflicting or inconsistent statements in a jury charge do not magically" cancel each other out. *Ante* at 345, 625 *A*.2d at 1069.

Concerning the first point—the need for "unmistakably clear" charges—although the Court correctly cites cases on

behalf of that general proposition, the facts of the instant case are not at all like the facts of the cases cited by the Court. In *Eden v. Conrail*, 175 *N.J.Super.* 263, 418 *A.*2d 278 (1980), *modified*, 87 *N.J.* 467, 435 *A.*2d 556 (1981), the Appellate Division noted that "the charge respecting the law was wholly divorced from any reference to the facts." *Id.* at 278, 418 *A.*2d 278. The trial court had fundamentally misconstrued and misstated the basic legal theory underlying the defendant's duty, "repeatedly referr[ing] to [the] plaintiff as a trespasser" and framing the central issue of the defendant's duty in an entirely erroneous manner. 175 *N.J.Super.* at 279, 418 *A.*2d 278.

The second case the Court cites in defense of holding the trial court to a standard of utterly unambiguous clarity is *Phillips v. Scrimente*, 66 *N.J.Super.* 157, 168 *A.*2d 809 (1962). *Ante* at 345, 625 *A.*2d at 1069. *Phillips* involved a matter of statutory interpretation. The Appellate Division described the disputed portion of the jury charge, in that case, as "obviously incomplete" and "difficult, if not impossible, for the jurors to comprehend." *Id.* at 162, 168 *A.*2d 809. Moreover, the court's decision in *Phillips* was based on the conclusion that "at no time did [the trial court] state the rule [of law] with sufficient completeness and accuracy to counteract the erroneous statements" contained in the jury charge. *Id.* at 163, 168 *A.*2d 809. But as I have argued, when read in context the trial court, in the instant case, accurately stated the relevant rules of law.

Concerning the Court's second justification for its literal reading of the charge, that "conflicting or inconsistent statements in a jury charge do not magically" cancel each other out, *ante* at 345, 625 *A.*2d at 1069, I take issue with the Court's claim that the sentence it quotes, out of context, from the jury charge is "conflicting or inconsistent" with any other statement in the charge. *Ante* at 345, 625 *A.*2d at 1069.

Relying on a contextual reading of the disputed sentence, and taking the jury charge on the significance of the FDA regulations on defendant's duty to warn, I would contend that the

jury charge provided by the trial court was adequate and, if imperfect, was certainly not so erroneous as to mislead the jury.

## B.

The second basis on which the Court rests today's decision to order a retrial suffers from a defect similar to the first. The Court determines that the jury charge impermissibly shifted the burden of proving unreasonable conduct from plaintiff to defendant. *Ante* at 478, 625 *A*.2d at 1071. The Court quotes from one sentence of the charge that read:

And, in addition thereto, you also may find for the defendant if you find that it has met its burden of proving that it acted as a reasonably prudent manufacturer in distributing Declomycin between 1960 and 1963 in light of the actual or constructive knowledge that it had of scientific, technological or other circumstances in that particular time.

For 1962 and 1963, defendant did not assert that it could not have known about the dangers of Declomycin. Accordingly, the only "burden" was on plaintiff to show that defendant had not acted reasonably in failing to warn of the dangers of its product. It is, therefore, fair to say that the section of the jury charge, excerpted above, is technically incorrect. It is not at all clear, however, that the jury was so misled or confused by that statement as to deny defendant a fair trial.

The sentence from the jury charge quoted above was preceded immediately by the trial court's statement to the jury that if the plaintiff had failed to meet its burden of proving any of the elements of its case, then the jury should find for defendant. More specifically, the trial court informed the jury that plaintiff had the burden of proving, by a preponderance of the evidence, "that the product, Declomycin, was defective, that the defect existed when the product left defendant's control and that the defect caused injury to a reasonably foreseeable user. The alleged defect in this case is the failure to warn of the side effect of tooth discoloration."

Earlier in the charge, explaining what plaintiff was required to prove, the trial court instructed the jury that "[a] defect may be established by proving that a defendant failed to provide either adequate warnings or a lack of warnings as to whatever dangers the product presented." Later, in explaining the ways that plaintiff might prove that Declomycin was defective, the trial court instructed the jury that "plaintiff may show [Declomycin's] defect by proving that there was either an inadequate or a lack of warning or instruction accompanying the product to make the use of it unsafe." The trial court also carefully explained that "reasonableness of the defendant's conduct is a factor to be considered in determining strict liability" and that "[a]vailable knowledge ... is a relevant factor in measuring reasonableness of conduct of a manufacturer."

From those statements, when read in the context of the whole charge, the jury was effectively informed that plaintiff bore the burden of proving that defendant had acted unreasonably in failing to provide an adequate warning on its product. Although the trial court might better have stated explicitly that plaintiff had to prove that with the knowledge of Declomycin's harmful side effects defendant had acted unreasonably in not issuing a warning, that directive was implicit in the instructions as a whole, and the failure to give such an explicit charge did not constitute reversible error.

The Court, in concluding that that omission was fatal, notes that "knowledge and reasonableness are clearly separate questions, and a shift of the burden to rebut the imputation of knowledge does not shift the burden to prove reasonableness of conduct." *Ante* at 478, 625 *A*.2d at 1071. Although, in the abstract, that proposition may be true, under the facts of plaintiff's case knowledge and reasonableness are not so "clearly separate questions."

The trial court instructed the jury that

when the strict liability defect consists of an improper warning or a lack of a warning ... reasonableness of the defendant's conduct is a factor to be considered in determining liability. The question in strict liability warning

cases is whether, assuming that the manufacturer knew of the defect in the product, it acted in a reasonably prudent manner in marketing the product or in not providing the warnings alleged. Available knowledge in defect warning situations is a relevant factor in measuring reasonableness of conduct of a manufacturer.

Significantly, the trial court's charge clearly distinguished between the harmful side effects of Declomycin (which defendant did not dispute) and the "defect" at issue in the case: the failure to warn. Moreover, the trial court recognized that knowledge and reasonableness are intertwined in assessing defendant's conduct. The decision of this court in *Feldman I* treats knowledge and reasonableness in a similar manner.

In expressing the burden on plaintiff in *Feldman I*, the Court stated: "Put another way, would a person of reasonable intelligence or of the superior expertise of the defendant charged with such knowledge conclude that defendant should have alerted the consuming public?" 97 *N.J.* at 452, 479 *A.*2d 374. The Court went on to hold that "[c]ommunication of the new warning should *unquestionably* be given to prescribing physicians as soon as reasonably feasible." *Id.* at 456, 479 *A.*2d 374. (emphasis added). Further, the Court noted that if plaintiff's father had had Declomycin on hand when defendant became aware of Declomycin's harmful side effects,

defendant would have had an obligation to warn doctors and others promptly. This most assuredly would include those to whom defendant had already furnished the product.... The extent and nature of post-distribution warnings may vary depending on the circumstances, but in the context of this case, the defendant at a minimum would have had a duty of advising physicians, including plaintiff's father, whom it had directly solicited to use Declomycin. [*Id.* at 457, 479 *A.*2d 374.]

Thus *Feldman I*, unchanged by *Feldman II*, held that defendant's knowledge of Declomycin's deleterious side effects virtually triggered the duty to warn plaintiff's father of the potential harm to his daughter. The trial court's instruction comports with that holding.

Although I do not minimize the theoretical distinction between knowledge and reasonableness, I nevertheless am impelled to ask what difference, on the facts of this case, a more

explicit distinction, for the jury, would have made? To my mind, two possible candidates exist for a response to that question.

The first, entirely legitimate, response has to do with the relevance of the FDA regulations. As I have already noted, defendant relied on the argument that the FDA regulations had prevented it from issuing a warning without federal approval. *Supra* at 359, 625 *A*.2d at 1076. One reading of the Appellate Division decision is that the jury might have concluded that, given that the FDA did not believe warnings on Declomycin were required, defendant did not act unreasonably in failing to provide such warnings. But that is precisely the issue to which the trial court directed the jury's attention: "[T]he exchange of correspondence and other communications between the Federal Food and Drug Administration and the defendant, Lederle Laboratories, have been admitted into evidence and may be considered by you on the issue of the reasonableness of defendant's conduct." After considering extensive evidence, the jury concluded that defendant had not acted reasonably. I see no reason to upset that determination.

The second, more plausible and more troubling, response is that the jury could have determined that defendant was reasonable in its erroneous belief that the FDA regulations had precluded it from issuing a warning.

In its summation to the jury, defendant suggested that it had no choice but to comply with the FDA regulations. That argument is very different from suggesting that it was reasonably persuaded by the FDA that a warning was unnecessary because the available information did not really demonstrate harmful side effects. Defendant nevertheless adhered to its position that it was in effect legally barred—not that it was simply influenced—by the FDA, and therefore did not issue a warning. When defendant registered an objection to the trial court's instruction on the relevance of the FDA regulations, defendant stated:

[H]ere we have before them [defendant's employees] a course of conduct [i.e.,
the failure to place a warning on Declomycin] clearly *dictated* by the Food and
Drug administration. And for the Court to have said—and for the Court not to
have charged that we did not *require* approval ... that they [the FDA] did not
*require* prior approval to amend their warning is to aggravate extraordinarily
and in a prejudicial way the status of this defendant and the course of conduct
which it maintains in this case and which we argued to this jury could be the
basis for a finding of reasonableness on the part of the defendant. (emphasis
added)

Clearly, defendant was contending at trial—and continues to
press on appeal, now, with apparent success—that the FDA
regulations prohibited it from issuing a warning on the danger-
ous side effects of Declomycin. This contention the Court
rejected definitively in *Feldman II.*

The danger of the Appellate Division decision below, and the
Court's treatment of reasonableness and knowledge in its opin-
ion today, is that it implicitly approves the task to which
defendant hoped to set the jury: that the jury should decide
whether defendant was reasonable in its belief that the FDA
regulations prohibited it from issuing other warnings. Allow-
ing the jury to undertake such a determination would mean
that, despite this Court's finding that federal law did not
absolve defendant of the duty to act reasonably in warning
consumers of the harmful side effects of Declomycin, the jury
should assess the reasonableness of defendant's belief that it
had been so absolved. Defendant would, in effect, be allowed
to try to evade liability for its actions by introducing evidence
that it had been reasonable in its mistaken interpretation of the
legal effects of compliance with FDA regulations. That is, in
fact, precisely what defendant did at the trial below.

The Court is faced, then, with only two possible options in
response to the question, "What difference, on the facts of this
case, a more explicit distinction between knowledge and reason-
ableness, for the jury, would have made?" The first option—
that the jury might have believed, even with the knowledge of
Declomycin's harms, that defendant had been reasonable not to
warn (particularly in the light of the FDA failure to require a

warning)—was offered to the jury in the trial court's instructions. The jury found defendant's conduct unreasonable.

On that point, the jury's determination of defendant's conduct could have involved many more legitimate considerations—considerations not explicitly addressed by the trial court's instructions. For example, the jury might have been persuaded by defendant's own studies of the harmful effects of Declomycin and, believing that defendant had greater knowledge of the side effects than the FDA, concluded that defendant had acted unreasonably in continuing to market the drug without a warning. Or, as Justice Clifford noted in *Feldman II*, the jury might have considered other actions defendant could have "reasonably and responsibly" taken. 125 *N.J.* at 153, 592 *A.*2d 1176. Those actions include suspending production of Declomycin until, as defendant anticipated, the FDA found the drug implicated in tooth-staining; pressing the FDA for approval of its warning; and removing from circulation the forms of Declomycin directed toward the pediatric market. *Ibid.* Defendant did none of those things and the jury, having heard evidence and argument to that effect, could surely have found that defendant, therefore, acted unreasonably.

There remains, however, a second option in answering the question of what difference a more detailed charge on "reasonableness" and "knowledge" would have made. That option is, in my judgment, implicitly endorsed by the Appellate Division opinion, namely, that the jury should have considered the reasonableness of defendant's mistake of law—its erroneous belief that FDA approval was required before defendant could issue a warning. That task was clearly not part of the jury's proper function in this case and, because of that, the second option must be rejected.

Accordingly, I cannot agree that defendant was prejudiced by a minor error in the trial court's statement of the burden of proof. That error consisted entirely of the trial court's failure to delineate, more explicitly, the distinction between defen-

dant's knowledge and the reasonableness of defendant's conduct. But since that distinction, in light of the instruction as a whole and the evidence placed before the jury, would have made little or no difference to the jury's determination, I do not believe a retrial is warranted on the burden-of-proof issue.

## *C.*

The final basis of the Court's decision today is the alleged error of the trial court properly to instruct the jury on the issue of apportionment.

The verdict form provided to the jury, and explained by the trial court in its charge, contained six interrogatories. Special interrogatory number two had four discrete parts.

Was there a defect in Defendant Lederle's product, Declomycin, because it failed to warn of tooth discoloration,
  A.  in 1960,
  B.  in 1961,
  C.  in 1962,
  D.  in 1963?

The jury was instructed that, should it respond affirmatively to one or more of the parts of interrogatory two, it should then determine whether defendant's failure to warn was the proximate cause of plaintiff's injuries. The trial court instructed that, should the jury answer the proximate cause question affirmatively, it should then determine a "fair and reasonable" compensation for plaintiff's losses.

The jury found that defendant was not liable for harm caused to plaintiff in 1960 and 1961. It did, however, find defendant liable for its failure to warn plaintiff in 1962 and 1963, and awarded plaintiff damages of $300,000. Defendant maintained, and the Court agrees, that the trial court's instructions were so deficient as to prevent the jury from properly apportioning damages. I disagree.

Ordinarily, this Court has placed the burden of proving apportionment on the plaintiff. See, *e.g., Paxton v. Misiuk,* 34 *N.J.* 453, 463, 170 *A.*2d 16 (1961). However, in medical malprac-

tice cases, the burden has been shifted to the defendant. *Fosgate v. Corona*, 66 *N.J.* 268, 272, 330 *A.*2d 355 (1974). In *Ostrowski v. Azzara*, 111 *N.J.* 429, 545 *A.*2d 148 (1988), this Court held that "[i]n the field of health care, given the difficulty of apportionment, sound public policy requires that the professional bear the burden of demonstrating the proper segregation of damages in the aggravation context." *Id.* at 443–44, 545 *A.*2d 148. The Court relies on *Ostrowski* to find that the trial court's instruction, in this case, did not allow the jury an adequate opportunity to apportion plaintiff's damages properly. *Ante* at 363–365, 625 *A.*2d at 1078–1079. The fundamental rationales of both *Fosgate* and *Ostrowski* —involving both power imbalances between medical professionals and patients, and public policy considerations of what party is most capable of demonstrating apportionment—would, I contend, argue in favor of shifting the burden to defendant in the instant case. Minimally, on the facts of this case, the equitable principles behind the Court's medical malpractice jurisprudence support the conclusion that the jury had an adequate basis upon which to apportion damages.

Although not extremely detailed in its discussion of the damages that might have been inflicted on defendant in each of the years in question, the instruction was adequate to guide the jury in apportioning damages. That conclusion is strengthened by the fact that the jury heard evidence on the issue of apportionment. That evidence came in the form of testimony from Dr. Milton Houpt, who testified on the manner in which drugs like Declomycin discolored teeth. Dr. Houpt's testimony, as the Appellate Division acknowledged, 257 *N.J.Super.* at 174, 608 *A.*2d 356, clearly suggested the incremental nature of the discoloring effect of Declomycin. Further, the jury heard the testimony of plaintiff's father, who was also the physician who had administered Declomycin to plaintiff as a child. Based on this evidence, along with testimony on the timing and dosage of plaintiff's consumption of declomycin, the jury could reasonably determine how to apportion damages. Thus, in accordance with

the trial court's instructions and in light of the relevant evidence, the jury determination should be understood to reflect its conclusion that defendant had proximately caused injury to plaintiff in 1962 and 1963 and that the "fair and reasonable" compensation for that harm—in 1962 and 1963—was $300,000.

The Court terms that amount a "most substantial award" for "injuries to plaintiff's teeth." *Ante* at 351, 625 *A.*2d at 1072. The Court implies that the award was somehow unreasonable. The record, however, supports another characterization: the award was meant to compensate plaintiff for the aggravation of her tooth discoloration and for the lasting pyschological injury that plaintiff sustained from that disfigurement.

The jury heard plaintiff's expert, Dr. Churgin, testify that repairing plaintiff's teeth would require that approximately twenty-eight of her teeth be capped or crowned. That, in turn, would necessitate between fifty-six and eighty-four visits for prosthodontic treatments. The total time of the procedure was estimated as taking between eighty-four and one hundred and sixty eight hours in a dentist chair.

Each tooth would have to be locally anesthetized. The Declomycin discolored enamel would have to be ground from it. A metal casting would then be placed on the tooth, followed by a porcelain casting meant to resemble a normal tooth. The total cost of those treatments was established at $15,400.

Another expert for plaintiff, Dr. Alvin Friedland, testified that she would require long term psychotherapy for an underlying depression caused by an impaired self-image. That depression and loss of self-esteem was caused by ridicule plaintiff had received as a child—ridicule prompted by plaintiff's noticeably discolored teeth. Dr. Friedland also testified to the way in which plaintiff's tooth discoloration had adversely affected her relationship with her father whom she unconsciously blamed for having caused her affliction. Defendant, for its part, offered no evidence to challenge Dr. Friedland's conclusions.

The jury, then, was presented with evidence of the economic and human cost of repairing the damage done to plaintiff's teeth by defendant's failure to warn of Declomycin's side-effects in 1962 and 1963, and the psychological damage caused by those side-effects. The jury may have believed that the discoloring of plaintiff's teeth was exacerbated by her consumption of Declomycin in 1962 and 1963 and, therefore, made more noticeable. Accordingly, the jury could have concluded that the ridicule and rejection that caused plaintiff's psychological problems were due to the effect of Declomycin in those years. The Court obviously disagrees with that conclusion, but that is not the same as saying that the conclusion is unreasonable.

I would contend, therefore, that the award of $300,000 to plaintiff, for the injury done to her in 1962 and 1963 is not, as the Court insinuates, disproportionate.

If the Court insists that the jury was not provided an adequate basis on which to determine apportionment, the more appropriate remedy is to order a remand limited strictly to the issue of damages. I do not believe such a remand is necessary. If it is, however, the limited nature of the remand would spare the enormous cost—in terms of time, energy, and financial expense—that a new trial will inevitably incur.

## II

One of the oldest maxims of the law is *Justitia non est neganda non differenda,* justice is neither to be denied nor delayed. By its decision today, the Court both denies justice to an injured plaintiff, who has twice proven her case with overwhelming evidence against defendant, and delays justice by forcing this already tortuously complex and expensive litigation through yet another trial.

Having commented extensively on the need for reading things in context, I cannot help but make a concluding remark on the historical context of this case and the posture of the parties. Defendant, a drug manufacturer with a net worth

near two billion dollars, aggressively marketed a product it knew to be harmful to what is, arguably, the most vulnerable class of consumers—sick children. Plaintiff, one of those children, was injured by that product and has spent the last fifteen years of her life—and one can only guess at what expense— pursuing justice for the harm done to her. The Court, by its decision, guarantees that her pursuit is not yet ended.

Because I am convinced that, if taken as a whole, and understood in the light of the evidence presented at trial, the instructions fully enabled the jury to resolve the issues of liability and damages in a manner both consistent with our law and fair to both parties, I dissent from the decision of the Court.

WILENTZ, C.J., and O'HERN, J., join in this opinion.

For Reversal—Chief Justice WILENTZ, and Justices HANDLER and O'HERN—3.

For modification and affirmance—Justices CLIFFORD, POLLOCK, GARIBALDI and STEIN—4.